Docket No. 91938–Agenda 7–March 2002.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.

 SCOTT HOPKINS, Appellee.

Opinion filed June 6, 2002.

JUSTICE FITZGERALD delivered the opinion of the court:

The question before us in this case is whether defendant’s extended-term sentence, pursuant to section 5–8–2(a)(1) of the Unified Code of Corrections (730 ILCS 5/5–8–2(a)(1) (West 1994)), complies with the rule announced in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We find that it does.

Defendant, Scott Hopkins, was convicted of first degree murder (720 ILCS 5/9–1 (West 1994)), armed robbery (720 ILCS 5/18–2(a) (West 1994)), aggravated battery (720 ILCS 5/12–4 (West 1994)), and home invasion (720 ILCS 5/12–11 (West 1994)). The circuit court of De Kalb County sentenced defendant to an extended term of 75 years’ imprisonment on the first degree murder conviction and a concurrent 20-year sentence on the armed robbery and the home invasion convictions. The appellate court affirmed the convictions, vacated the 75-year sentence, and remanded the cause with directions. No. 2–99–0678 (unpublished order under Supreme Court Rule 23). The State filed a petition for leave to appeal, raising one issue, the propriety of the appellate court’s reversal of defendant’s extended-term sentence. 177 Ill. 2d R. 315(a). In responding to the petition for leave to appeal, defendant requested cross-relief on the question of whether the appellate court erred in affirming his conviction. 177 Ill. 2d R. 315(a); 155 Ill. 2d R. 318(a). For the following reasons we affirm in part and reverse in part.

BACKGROUND

On July 29, 1995, police found the body of 70-year-old Burdette Johnson. He had been hit over the head with a frying pan and stabbed more than 15 times with a screwdriver to the chest and neck. He remained in a coma for nearly a month before succumbing to his wounds.

Defendant was charged with first degree murder, aggravated battery, armed robbery, and home invasion. On September 20, 1996, after a jury trial, he was found guilty on all counts. On December 26, 1996, the trial court granted defendant’s motion for a new trial based on the State’s failure to disclose to defense counsel that a witness, Mark Slater, had been promised that he would not be prosecuted in exchange for his testimony.

Defendant’s second trial began on February 1, 1999. At the second jury trial, Glen Butler testified that Johnson lived on the first floor of a two-unit home. Butler rented the second-floor apartment from Johnson. Mark Slater, his roommate, lived with him in the upstairs apartment. Slater’s friend, June Gibson, often came to the apartment and kept some of her belongings there. On July 29, 1995, at approximately 7 p.m., Butler was with Johnson in the downstairs apartment. Slater and defendant were in the upstairs apartment drinking beer. After telling Slater and defendant to keep the noise level down because they were disturbing Johnson, Butler left to go to work around 8:30 p.m.

While in the upstairs apartment, defendant asked Slater if Johnson had any money. Defendant then told Slater that he was going to get some money from Johnson’s apartment. At that point, Slater testified, he left the apartment and went to visit some friends, Tim and Mary Cunz. He remained at the Cunz’s for approximately 5 or 10 minutes before walking a few blocks to Hallgren Park. While at the park, Slater saw Gibson drive by. After about 15 minutes he returned to his apartment.

The defendant returned to the apartment approximately 10 minutes after Slater. He asked Slater if he wanted some beer. Defendant then went downstairs and returned with a six-pack of beer. After finishing the beer, defendant went downstairs to get some cigarettes. When he returned the second time, Slater saw that he was wearing a pair of white surgical gloves. He told Slater not to go downstairs because “it was not a pretty sight.” Slater testified that defendant told him that he stabbed Johnson in the shoulder, temple and the neck. Defendant had scratches both on his neck and his shoulder.

Defendant and Slater left the apartment together and walked to Hallgren Park. At the park, Slater saw defendant throw a washcloth with some stains on it into a garbage can. Slater then told defendant that he was going to return to the house to check on Johnson. He found Johnson covered in blood and called 911. Slater waited at the scene until the ambulance and the police arrived. The police checked Slater for the presence of blood but found none. Slater did not tell the police that defendant stabbed Johnson until he was transported to the police station for further questioning.

At the police station, Detective Gary Spangler examined Slater’s clothes and body for the presence of blood. Detective Spangler found no blood on Slater. Based on Slater’s interview, police officer’s located a rag, a piece of cloth, and a screwdriver in a trash can in Hallgren Park.

June Gibson, a recovering crack cocaine addict, testified that during the mid-afternoon of July 29, 1995, she saw Slater and defendant drinking beer in the backyard of Johnson’s house. Later that evening, she and a friend, Jenny, drove by Hallgren Park and saw Slater alone. As she drove past him, Slater waved. About 30 to 40 minutes later, Gibson and Jenny stopped at the park and gave Slater some cigarettes. They then stopped at the Cunz’s residence so that Gibson could drop off a dress before going to the De Kalb Motel.

At the motel, Gibson waited until a girlfriend, Brenda Parkins, arrived. Gibson and Parkins left the motel to buy some beer and cigarettes and drove past Johnson’s house. After noticing that the lights were off, Gibson decided to check on Johnson. Gibson testified that she entered the house through Butler’s apartment. When she entered, there were still no lights on in Johnson’s apartment. However, when she looked downstairs two minutes later, all of the lights and the television were on.

As she descended the stairs, she called for Johnson and heard a noise that sounded like someone falling. When she reached Johnson’s apartment, she saw Johnson, lying on the living room floor, reaching for his cane. She also saw defendant, who was not wearing a shirt, and was gripping the handle of a screwdriver. When defendant turned toward her, Gibson ran to the apartment upstairs and then down the back stairs to the car.

Gibson did not tell Parkins what she had seen. Instead, they drove around for a while before returning to Johnson’s house. By that time, the police had arrived and taped off the area around the house. Gibson did not talk to any of the police officers at the scene. Instead, she testified, she returned home and called 911. She asked the 911 operator why the area was roped off. When the operator told her that she could not provide Gibson with any information, Gibson responded, “I just want to know if somebody’s dead.”

In response to the 911 call, Officer Johathan Castilow went to the De Kalb Motel to see June Gibson. He testified that she told him that “Scott” had hurt Johnson. Gibson refused to go to the police station with Officer Castilow. Instead, Gibson prepared a statement for the police two weeks following the incident. She stated in the statement that she opened the door to Johnson’s apartment, looked in and saw defendant standing in the hallway leading to Johnson’s kitchen or bathroom and that she saw Johnson sitting in a chair. She further stated that defendant was wearing shorts and a tank top. In the statement she did not state that she saw defendant holding a screwdriver in his hand. Gibson later testified at trial that she did not remember preparing the statement and that she lied about Johnson’s location because she did not want to cooperate with the police.

Bonnie Fleicher, defendant’s mother, testified that on August 1, 1995, she found defendant lying on the porch of her home. He told her that he had been sleeping under a bridge. She informed him that the police were looking for him. Defendant then took a shower and went to his sister’s house in St. Charles. Fleicher did not see any stains on defendant’s shirt, other than sweat stains under the armpits.

Detective Spangler obtained a warrant to search Fleischer’s home for the clothes worn by defendant on the night of the murder. He found the clothes in a laundry basket. The shorts had a pattern of stains that appeared to be blood similar to the pattern of stains found on a pillow case collected from Johnson’s apartment.

Detective Moor interviewed Eric Wilson regarding defendant’s whereabouts on the night of the murder. Wilson held a party at his house that night. Defendant came to the party with a bottle of Kesslers whiskey, cigarettes and some rubber gloves. Wilson saw defendant try on the gloves. He did not, however, notice any blood on defendant. Darlene McCulloch also saw defendant at the party. He was holding a bottle of Kessler’s whiskey, as well as Marlboro and Winston cigarettes. He was not wearing a shirt and she saw that he had some scratches on his am. Defendant stayed at Wilson’s house through the night.

Several stains collected from the shirt and shorts that defendant was wearing on the night of the murder tested positive for the presence of blood. James Bald, a forensic scientist, found six areas on the shorts contained human blood. Two out of nine areas on defendant’s shirt tested positive for the presence of human blood. Bald also conducted a preliminary test on the stain located on defendant’s shoe and determined that it tested positive for the presence of blood. He also found human blood on the frying pan and the screwdriver.

Officer James Rhoades collected fingernail scrapings from Johnson. He testified that the scrapings did not match defendant’s DNA.
(footnote: 1) He further testified that Johnson’s DNA, was found on a small stain located on a turquoise shirt that defendant was wearing on the night of the incident.
(footnote: 2)
 Tim Cunz, and his daughters Misty and Savanna, testified that they lived two blocks from Johnson’s house. They testified that on the night of the murder, Slater stopped by the house looking for a person named Leon Richardson. Misty had never known Slater to come to the house and thought his visit unusual. Savanna stated that June Gibson stopped by the house to drop off a dress a couple of hours after Slater left.

While incarcerated at the De Kalb County jail, defendant told Eric Frias that he “stabbed the elder man in the head, neck and chest area again and again,” and that the man fell to the floor. Frias, who pleaded guilty to four felonies for robbery and theft, stated that he was not offered any deals or agreements in exchange for his testimony at defendant’s trial. 

Dr. Larry Blum testified that he performed the autopsy on Johnson. Johnson suffered from 10 stab wounds to the left upper region of the chest and an additional five stab wounds to the head. Dr. Blum also noted defensive wounds on Johnson’s arms as well as a laceration to Johnson’s left eye. This laceration was consistent with blunt trauma, such as being hit with a frying pan. Dr. Blum did not conduct a test of Johnson’s fingernail scrapings and was unable to testify whether Johnson caused the scratches found on defendant.

Defendant testified that a month and a half before the murder, Slater and Gibson moved into the apartment above Johnson’s apartment. He briefly met Johnson when he helped Slater move in but otherwise had no contact with Johnson.

Defendant further testified that at the time of the incident, he was living in an apartment with his girlfriend and her two small children. Shortly after noon on July 29, 1997, he left the apartment after having an argument with his girlfriend. He went to a bar where he had a few beers. Slater came to the bar and the two of them stayed there for a couple of more hours before returning to Slater’s apartment. He and Slater then went to visit Tim Gord, a friend of Slater. They remained there approximately 45 minutes before returning to Slater’s apartment.

He stated that, at the apartment, Slater went downstairs to talk to Butler. When he came back, he had a brown paper bag from which he removed a bottle of whiskey. Slater left again for 20 to 30 minutes. When he returned, defendant testified, he picked up defendant’s shirt, which was draped over a chair, and told him that they had to leave the apartment because Johnson was going to call the police and accuse them of trespassing. Slater put the whiskey bottle back in the bag and handed it to defendant. He then told defendant that he would wait for the police to arrive in order to get his belongings out of the apartment. At this point, defendant put on his shirt and walked to Wilson’s house. When he arrived at Wilson’s house, he looked inside the bag and saw the whiskey, a package of Winston cigarettes, and rubber gloves.

Defendant left Wilson’s house around 1:30 p.m. on July 30, 1995, and decided to walk to his girlfriend’s workplace. He stopped under a bridge located nearby to wait for her and fell asleep. He did not awaken until early the next morning, at which point he walked to his mother’s house and found out that he was wanted by the police.

The jury convicted defendant of first degree murder, armed robbery, aggravated battery, and home invasion. The aggravated battery charge merged with the first degree murder charge. The trial court sentenced defendant to a term of 75 years’ imprisonment for first degree murder and a concurrent 20-year term for the armed robbery and home invasion convictions.

The appellate court affirmed defendant’s convictions for first degree murder, armed robbery, and home invasion, vacated the sentence of 75 years’ imprisonment for first degree murder, and remanded the cause to the trial court. No. 2–99–0678 (unpublished order under Supreme Court Rule 23). The State appealed.

ANALYSIS

Initially, we examine whether the appellate court erred in finding that defendant’s extended-term sentence violated the rule set forth in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Because this appeal presents a question of law, we review this issue 
de novo
. 
People v. Fisher
, 184 Ill. 2d 441, 448 (1998).

 The trial court sentenced defendant to a 75-year extended-term sentence for first degree murder, finding that the victim was over the age of 60, the crime was exceptionally brutal and heinous, and the victim was physically handicapped. The appellate court found that although the victim’s age was proven beyond a reasonable doubt, the victim’s disability and the exceptionally brutal and heinous nature of the crime was not. According to the appellate court, the sentence violated 
Apprendi
.

In 
Apprendi
, the United States Supreme Court held that “[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” 
Apprendi
, 530 U.S. at 490, 147 L .Ed. 2d at 455, 120 S. Ct. at 2362-63. 
Apprendi
, however, “does not proscribe all judicial fact finding at sentencing, even though it may result in an increase in a defendant’s punishment ***.” 
People v. Carney
, 196 Ill. 2d 518, 526 (2001). In fact, the Court in 
Apprendi
 explained that “nothing *** suggests that it is impermissible for judges to exercise discretion–taking into consideration various factors relating both to offense and offender–in imposing a judgment 
within the range
 prescribed by statute.” (Emphasis in original.) 
Apprendi
, 530 U.S. at 481, 147 L. Ed. 2d at 449, 120 S. Ct. at 2358.

In 
People v. Wagener
, 196 Ill. 2d 269, 286-87 (2001), we recognized that although 
Apprendi
 contains “isolated statements which *** appear to support the conclusion that the jury must find beyond a reasonable doubt each and every fact which might have any real-world impact on the length of time the defendant might spend in prison,” these statements “cannot be taken out of context.” In fact, in 
People v. Ford
, 198 Ill. 2d 68, 74 (2001), we clarified that “
Apprendi
 does not require that 
every
 fact related to sentencing be proved beyond a reasonable doubt.” (Emphasis in original.)

In 
Ford
, following a bench trial, the defendant was convicted of first degree murder. 
Ford
, 198 Ill. 2d at 71. The trial court found the defendant eligible for the death penalty. It declined, however, to impose the death penalty and instead imposed an extended-term sentence of 100 years based upon its finding that the murder “ ‘was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.’ ” 
Ford
, 198 Ill. 2d at 71. The defendant argued that his 100-year extended-term sentence was unconstitutional under 
Apprendi
 because the brutal and heinous nature of the crime was not proven beyond a reasonable doubt.

In resolving this issue, we noted that after the trial court found, by proof beyond a reasonable doubt, that the defendant was eligible for the death penalty, death was the prescribed statutory maximum sentence. 
Ford
, 198 Ill. 2d at 73-74. Therefore, “based exclusively on the facts that were proved beyond a reasonable doubt” the 100-year extended-term sentence clearly complied with the rule announced in 
Apprendi
. 
Ford
, 198 Ill. 2d at 74. In other words, because the maximum sentence was death and the sentence actually imposed was 100 years, the extended-term sentence clearly complied with the rule announced in 
Apprendi
. 
Ford
, 198 Ill. 2d at 73.

We further determined that it was immaterial that the aggravating factor used to impose defendant’s 100-year sentence, that the murder was accompanied by exceptionally brutal or heinous behavior, was not proved beyond a reasonable doubt. 
Ford
, 198 Ill. 2d at 72. Specifically, we noted that “
Apprendi
 requires that only those facts that increase the penalty for a crime 
beyond the prescribed statutory maximum
 be proved beyond a reasonable doubt.” (Emphasis in original.) 
Ford
, 198 Ill. 2d at 74. In the present case, defendant was sentenced under section 5–8–2, which provides:

“(a) A judge shall not sentence an offender to a term of imprisonment 
in excess of the maximum sentence authorized by Section 5–8–1
 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of section 5–5–3.2 were found to be present. Where 
the judge finds
 that such factors were present, he may sentence an offender to the following:

(1) for first degree murder, a term shall be not less than 60 years and not more than 100 years[.]” (Emphases added.) 730 ILCS 5/5–8–2(a)(1) (West 1994).

Section 5–5–3.2(b) provides:

“(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; or

*** 

(4) When a defendant is convicted of any felony committed against:

***

(ii) a person 60 years of age or older at the time of the offense ***; or

(iii) a person physically handicapped at the time of the offense ***[.]” 730 ILCS 5/5–5–3.2(b) (West 1994).

As a threshold matter, we note that a finding that defendant was over 60 years of age, standing alone, would permit the trial court to sentence defendant to an extended-term sentence. A trial court need find only a single statutory factor in aggravation to impose an extended sentence.

 Here, defendant concedes that the age of the victim was an element which was proved beyond a reasonable doubt. The jury returned a verdict of guilty on defendant’s aggravated battery charge. This charge included the victim’s age as an element of the offense. The trial court merged the aggravated battery charge with the first degree murder charge. As such, it is undisputed that the age of the victim was an element that was proved beyond a reasonable doubt. He asserts, however, that the trial court’s finding of two additional aggravating factors–that the murder was accompanied by exceptionally brutal and heinous behavior and that the victim was disabled–violated 
Apprendi
. 

As we stated in 
Ford
, the fact that the brutal and heinous nature of defendant’s crime and the victim’s disability was not proved beyond a reasonable doubt is not material. See 
Ford
, 198 Ill. 2d at 72. We decline to depart from this precedent. Instead, we look to whether consideration of those additional elements would have increased defendant’s sentence 
beyond
 the prescribed statutory maximum. We answer that question in the negative.

The maximum sentence in this case was 100 years imprisonment. Defendant was clearly sentenced within that range. The additional finding of brutal and heinous behavior and that the victim was disabled did not 
increase
 defendant’s sentence beyond the prescribed statutory maximum. Instead, it aided the trial court in creating an appropriate sentence based on the facts of the crime.

We observe that when any statutory enhancing aggravating factor is proved to exist beyond a reasonable doubt, such as the age of the victim in this case, the original sentencing range increases according to the statutory scheme. See 730 ILCS 5/5–5–3.2 (West 1994). Additional aggravating factors can be considered by the trial judge, including statutorily enhanced factors not proved beyond a reasonable doubt, to fashion an appropriate sentence within the new sentencing range. We decline to eliminate a trial court’s discretion in this area. As such, the principles discussed in 
Apprendi
 were not violated in this case.

We now turn to defendant’s request for cross-relief. Defendant argues that the evidence presented at trial was insufficient to prove him guilty of murder. Specifically, he argues that the testimony of three of the State’s witnesses–Mark Slater, June Gibson and Eric Frias–were inconsistent and not credible. As such, defendant maintains the appellate court erred in finding that the State presented sufficient evidence to find him guilty beyond a reasonable doubt. We disagree.

The relevant inquiry in reviewing the sufficiency of the evidence to sustain a verdict on appeal is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution. 
People v. Cooper
, 194 Ill. 2d 419, 431 (2000).

In the present case, Mark Slater testified that he was with defendant on the night of the murder. The police interviewed Slater at the scene of the crime and examined his clothing for the presence of blood. They found none. Human blood, however, was found on defendant’s clothes, socks, and shoes. A drop of the victim’s blood was found on the shirt that defendant had worn on the day of the murder. Defendant’s shorts also had a pattern of blood splatters similar to the pattern of splatters found at the scene.

Slater testified that after defendant returned from the victim’s apartment, he had on surgical gloves and told Slater that he stabbed the victim in the shoulder, neck and temple. June Gibson testified that she often cared for the elderly victim and that she kept surgical gloves in the victim’s bathroom. She further testified that she saw defendant in the victim’s apartment on the night of the murder with a screwdriver in his hand. Finally, Frias testified that while they were incarcerated together in the De Kalb County jail, defendant told him that he stabbed the victim several times in the head, neck, and chest.

At trial, defendant explained the presence of the bloodstain on his clothing. His explanation, however, could be rejected or accepted by the jury. Although, as the appellate court noted, there were “some problems of credibility and inconsistent statements,” the jury, nonetheless, found defendant guilty. It is for the fact finder to resolve conflicts or inconsistencies in the testimony of witnesses. 
People v. Bull
, 185 Ill. 2d 179, 204-05 (1998). A reviewing court should not substitute its judgment for the trier of fact. 
Cooper
, 194 Ill. 2d at 431.

CONCLUSION

For the foregoing reasons, we conclude that because the age of the victim was proven beyond a reasonable doubt, the trial judge could consider the additional statutorily enhanced aggravating factors–the brutal and heinous nature of the crime and the victim’s disability
–
in determining an appropriate sentence within the prescribed statutory range. This determination did not violate the rule set forth in 
Apprendi
. Further, we decline to disturb the appellate court’s order affirming defendant’s conviction.

For the reasons set forth in this opinion, we affirm in part and reverse in part the judgment of the appellate court and affirm the judgment of the circuit court.

Appellate court judgment affirmed in part 

and reversed in part;

circuit court judgment affirmed.

FOOTNOTES
1:
The State and defense stipulated that if called as a witness, Karen Quandt, a molecular biologist, would testify that defendant was excluded as the source of the DNA obtained from the scrapings taken from beneath the victim’s fingernails.

2:
The State and the defense stipulated that Quandt would testify that she performed DNA testing on a material cutting of defendant’s turquoise shirt and the victim’s shirt. The results obtained were that the DNA banding pattern from defendant’s shirt matched the DNA banding pattern obtained from the bloodstain on Johnson’s shirt. The DNA banding pattern frequency is one in 10 billion for Caucasians.