THIRD DIVISION
November 10, 2009

No. 1-08-0015

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| EFREN AGUILAR, | ) | Honorable |
| | ) | Stanley Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant, Efren Aguilar, was found guilty of first degree murder in the shooting death of Brandon McClelland. The trial court sentenced defendant to 50 years' imprisonment–25 years on the first degree murder conviction and an additional 25 years for using a firearm during the offense. The trial court denied defendant's motion for a judgment of acquittal notwithstanding the verdict or a new trial and his motion to reconsider the sentence. On appeal, defendant argues that the trial court erred in excluding testimony from an eyewitness identification expert and in admitting evidence of defendant's other crimes. He also contends that the State failed to prove him guilty beyond a reasonable doubt and that the trial court's sentence of 50 years was excessive, given that he is only 20 years old.[1] For the reasons set forth below, we find no reversible error and affirm defendant's conviction and sentence.

---

[1] We note that defendant has not filed a reply brief with this court.

## I. BACKGROUND

On May 29, 2004, at approximately 10:30 p.m., 18-year-old Brandon McClelland and three friends were sitting in Bessemer Park, located at 89th Street and South Chicago Avenue in Chicago, Illinois, when a young man rode up on a bike and asked, "What y'all is?" which the men took to mean, "What gang are you in?" Some of the men responded that they were not in a gang, and the man on the bike pulled a gun from his waistband and began shooting. McClelland was struck in the back by a bullet and later died at the hospital. Within 24 hours of the shooting, two of McClelland's friends, who were with him in the park, identified defendant as the shooter from a photo lineup. The third witness also picked defendant out as the shooter, but stated that he would need to see him in person to be sure. Immediately after the shooting, Chicago police officer Lou Toth, whom was assigned to the area that included Bessemer Park, received a radio dispatch with a description of the shooter. Since the defendant, whom Toth knew prior to the shooting, matched that description, he and other police officers searched for defendant at his home and the neighborhood around Bessemer Park, to no avail. An arrest warrant was issued for defendant in December 2004. The police continued, without success, to look for defendant in subsequent months.

On April 25, 2006, defendant was pulled over by the Chicago police for driving without headlights, two blocks from the scene of the shooting. When the police asked defendant his name, he stated that it was "Jose Chevez." After the police noticed a gun on the floorboard of the car, defendant fled in his car at a high rate of speed until the car crashed. Defendant then fled on foot and, according to the pursuing police officer, pointed a gun at the officer, although no gun

was found when defendant was apprehended. After being placed in custody, defendant again told the police that his name was "Jose Chevez"; however, the police determined that his real name was "Efren Aguilar" for whom an arrest warrant had been issued in connection with the shooting death of McClelland. Defendant was placed under arrest, and the police asked the three eyewitnesses to view a physical lineup that included defendant. All three identified defendant as the person who shot McClelland.

By indictment, the State charged the defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2)(West 2006)), alleging that on May 29, 2004, defendant shot and killed McClelland and that during the commission of the offense, defendant personally discharged a firearm that proximately caused McClelland's death.

Because the evidence at trial would rest primarily on the testimony of the three eyewitnesses, prior to trial defendant filed a motion *in limine* requesting that he be allowed to introduce testimony from Geoffrey Loftus, a psychologist, who would testify about scientific research concerning the passage of time between the incident and the identification, the lack of correlation between the certainty with which a witness makes an identification and the validity of that identification, and the effect of stress on the witness and weapon focus. Attached to the motion was an exhibit prepared by Loftus, more specifically outlining 10 topics he would address in his testimony.

After a hearing, the trial court denied the motion. Relying on the holdings in People v. Enis, 139 Ill. 2d 264 (1990), People v. Tisdel, 316 Ill. App. 3d 1143 (2000) (Tisdel I), and People v. Tisdel, 338 Ill. App. 3d 465 (2003) (Tisdel II), the court stated that a trial judge has discretion

to allow or exclude eyewitness identification expert testimony. The court found that expert testimony on the issue of eyewitness identification is more likely to confuse rather than assist the jury, that permitting the testimony would likely turn the case into a battle of experts with the jurors choosing the expert they liked better, and that the jury instructions adequately addressed the issue by listing factors the jurors should consider in assessing the reliability of eyewitness identification testimony.

Defendant filed a motion to reconsider the ruling. In addition to restating the arguments from the earlier motion, defendant argued that pursuant to People v. Allen, 376 Ill. App. 3d 511 (2007), which was issued shortly before the court denied the motion *in limine,* Loftus should be permitted to testify. In Allen, this court held that the trial court erred in refusing to permit an eyewitness identification expert to testify. However, as the trial court noted, the Allen decision was based on a finding that the trial court failed to conduct any kind of meaningful evaluation of the expert witness's testimony. Allen, 376 Ill. App. 3d at 526. Therefore, following Allen, the trial court evaluated Loftus's proffered testimony in light of the facts and circumstances of the instant case and found that it was either not relevant, was addressed by jury instructions or was speculative and would not assist the jury. As a result, the court denied the motion to reconsider.

The State also filed a pretrial motion *in limine* requesting that evidence of other crimes be admitted to show consciousness of guilt, flight, identity of the defendant, and the circumstances of the arrest. In particular, the State wanted to show that defendant's mother and brother knew the police were looking for him and that on the date he was pulled over, the defendant gave the police a false name, fled the scene, and pointed a gun at the police. After a hearing, the trial court

granted the motion, finding that evidence of defendant's flight from the police was relevant and admissible as evidence of defendant's consciousness of guilt, but reserved for a later date a decision on precisely what evidence the State could introduce regarding the arrest.

At trial, the three eyewitnesses who were with McClelland on the night he was shot testified. First, Dominique Bryson testified that on May 29, 2004, at approximately 10:30 p.m., he, McClelland, Dominic Pettis, and Phillip Villarreal were sitting in Bessemer Park talking and sharing one "blunt" of marijuana when they were approached by a man on a bike. According to Bryson, the man came within seven or eight feet of them, dropped his bike and asked them "What y'all is?" which Bryson took to mean, "What gang are you in?" Bryson could not recall if any of the four men responded to the question. Bryson said that the man repeated the question and at the same time, pulled a gun from his waist. Bryson said that upon seeing the gun, all four men turned and ran in different directions. Bryson testified that he heard six to eight gunshots and that he ran to his car, which was parked nearby, and drove off. Bryson tried calling McClelland's cell phone several times. Villarreal eventually answered and told Bryson that McClelland had been shot. Bryson testified that after stopping at a friend's house, he went home and wrote down a description of the shooter so that he could tell the police. Bryson's written description stated that the shooter was Latino, 5 feet 9 inches to 5 feet 10 inches 150 to 170 pounds, 15 to 17 years old, with a shaved head and a ponytail, and wearing a red shirt with dark pants.

The next day, Bryson went with his parents to the police station, explained what happened and gave the police his written description of the shooter. The police asked Bryson to view a photo lineup. Bryson viewed the photos and identified defendant as the person who shot

McClelland and placed his signature next to defendant's photo. On May 18, 2006, Bryson was asked to return to the police station to view a lineup. Bryson identified defendant as the shooter. He also identified defendant when testifying before the grand jury on May 19, 2006, and made an in-court identification of defendant at trial.

Dominic Pettis's testimony regarding the events in Bessemer Park on the evening of May 29, 2004, was nearly identical to Bryson's testimony. However, he stated that when the man on the bike asked "What y'a'll is?" he, McClelland and Villarreal responded that they were not in a gang but Bryson asked the man what gang he was in. According to Pettis, the man responded, "What?" and Bryson took off running. Pettis saw the man pull out a gun from his waist and he, along with McClelland and Villarreal, got up and ran. Pettis heard a gunshot, fell to the ground and then heard six or seven gunshots. Pettis stayed on the ground for four or five minutes until he heard the bike ride off. He then got up, and when he did not see any of his friends, went home. Pettis called McClelland's phone. Villarreal answered and told Pettis that McClelland had been shot. Pettis went back to the park and spoke to the police. The police took Pettis and Villarreal to the police station in separate squad cars. Pettis told the police that the shooter was male, Hispanic, around 16 or 17 years old, with a bald head and a long ponytail, and wearing a red shirt. Pettis viewed a photo lineup and identified defendant as the shooter but stated that he would have to see the suspect in person to be sure. As a result, the police did not ask him to sign the photo. On April 25, 2006, Pettis viewed a lineup at the police station and identified defendant as the person who shot McClelland. He also identified defendant as the shooter when he testified before the grand jury on May 5, 2006, and made an in-court identification of defendant at trial.

Phillip Villarreal similarly testified that while he, McClelland, Pettis and Bryson were sitting in Bessemer Park on the evening of May 29, 2004, talking and smoking marijuana, a man rode up on a bike and stopped approximately 20 feet in front of them. According to Villarreal, the man had his right hand tucked under his shirt and asked them "What y'all is?" Villarreal, McClelland and Pettis responded that they were not in a gang and Bryson asked the man what gang he was in. The man on the bike pulled a gun from his waist and the four men got up and ran. Villarreal said that he and McClelland were running next to each other and Villarreal heard five or six gunshots. McClelland told Villarreal that he had been shot and Villarreal saw blood coming from the back of McClelland's jacket. Villarreal flagged down a police car that was driving past, and the police radioed for an ambulance. Villarreal spoke with an officer about what happened and described the shooter as male, Hispanic, bald with a ponytail, 5 feet 5 inches to 5 feet 7 inches, 15 to 17 years old and wearing a red shirt and black pants or shorts. The police took Villarreal to the police station where he viewed a photo lineup, immediately identified defendant as the shooter, and signed his name underneath defendant's picture. Villarreal viewed a lineup on April 25, 2006 and identified defendant as the shooter. When he testified before the grand jury, Villarreal identified defendant in a photo as the man who shot McClelland and made an in-court identification of defendant during trial.

Chicago police officer Lou Toth testified that on May 29, 2004, he and his partner were on patrol in an area near Bessemer Park when they received a radio dispatch with a description of a man wanted in connection with a shooting in the park. The man was described as a teenage male Hispanic, approximately 5 feet 5 inches to 5 feet 6 inches, with a shaved head and ponytail,

riding a bike and wearing a red T-shirt. Toth testified that he knew that the defendant, who he said was a "self-admitted Latin King," lived near the park and matched the description of the shooter. Toth drove to defendant's house, but said that neither the defendant nor his bike was there. Toth then drove to the scene of the shooting and told the detectives there that he suspected defendant might be the shooter. The next day, an investigative alert was issued for defendant. Toth continued to look for defendant, going to Latin King hangouts to question people about defendant's whereabouts and to defendant's house on several occasions over the next two years, but never located defendant.

Detective James Hladik testified that he was assigned to investigate the shooting at Bessemer Park on May 29, 2004. After speaking with Toth, Hladik and other officers went to defendant's house to look for him. When they did not see the defendant or a bicycle outside the house, the officers knocked on the door of defendant's house. With the permission of defendant's mother, the officers entered and searched the house but did not find defendant.

Hladik testified that on the night of the shooting, he spoke with Villarreal and Pettis at Area 2 headquarters and that both witnesses gave similar descriptions of the perpetrator as a male, Hispanic teenager, with a closely shaved head and ponytail and wearing a red shirt and dark pants. Hladik also conducted the photo lineup for Villarreal and Pettis. The day after the shooting, Hladik spoke with Bryson, who gave detectives a slip of paper with a written description of the shooter. Bryson also told Hladik that the shooter was male, Latino, 5 feet 9 inches to 5 feet 11 inches, 15 to 16 years old, with a shaved hair and a ponytail, 140 to 170 pounds and wearing a red shirt and dark jeans. In December 2004, Hladik obtained an arrest

warrant for defendant.

Officer Richard Arroyo testified that on April 25, 2006, at approximately 1:30 a.m., he and his partner were on patrol when they received a call about a burglar alarm at Bowen High School at 89th Street and Marquette Avenue. While they were looking around the school building, Arroyo saw a car at the corner of 89th and Marquette without its headlights on. Arroyo drove toward the car and saw it turn into an alley. Arroyo next saw the car on 89th Street and South Chicago Avenue. He activated his Mars lights and siren and followed the car for three or four blocks until it pulled over. Arroyo approached the car on the driver's side while his partner approached on the passenger side. Arroyo asked the driver for his license and insurance card, which the driver did not produce. Arroyo then asked the driver his name and the driver responded "Jose Chevez." Arroyo recognized that the driver was actually Efren Aguilar, who was wanted for homicide. Arroyo's partner yelled, "Gun." Arroyo saw a gun on the passenger side floor and said that he tried to grab the driver through the window, but the driver drove off at a high rate of speed. Arroyo and his partner ran back to their squad car and pursued defendant, until his car came to an abrupt stop at a railroad embankment. Defendant then exited the car and ran into the railroad yard at 94th Street, and Arroyo and his partner chased him on foot. During the chase, Arroyo saw defendant turn around and point a gun at him. Arroyo pulled out his gun and fired one shot. Arroyo testified that he identified himself as a Chicago police officer and told the defendant to stop and drop the gun but defendant continued to run. Arroyo lost sight of defendant, but eventually caught up with him again. Arroyo thought defendant was going to fire his gun again, so Arroyo fired his gun a second time, but missed defendant. Arroyo eventually

caught defendant, tackled him and handcuffed him. When he rolled defendant over, Arroyo found a cell phone underneath defendant but no gun. Arroyo and several officers subsequently searched the railroad yard but did not find a gun.

Detective Pat Hackett testified that on April 25, 2006, he and his partner were assigned to investigate an aggravated assault to a police officer at the rail yard near 94th Street. Hackett spoke with defendant, who told Hackett that his name was "Jose Chevez," that he lived at 9013 South Commercial and was born on February 16, 1987. After speaking with other police officers about defendant's identity and reviewing photos of defendant and his identifying marks, including tattoos of the words "Latin" and "King" on his right and left wrist, Hackett determined that he was Efren Aguilar.

Defendant offered no witnesses at trial but presented a stipulation that Detective Artega would testify that the ages of the participants in the lineup viewed by Bryson were 27, 39, 40, 19 and 38. In the State's rebuttal, it was stipulated that Detective Artega would testify that the age of the participants in the lineup viewed by Villarreal and Pettis were 19, 17, 17, and 18.

After deliberations, the jury found the defendant guilty of the murder of Brandon McClelland. Following trial, defendant filed a motion for a judgment of acquittal notwithstanding the verdict or, alternatively, a new trial, asserting that the trial court erred when it excluded testimony from his eyewitness identification expert. The court denied the motion for a new trial and sentenced defendant to 50 years in prison. Defendant's motion to reconsider the sentence was denied on December 18, 2007. This appeal followed.

## II. ANALYSIS

Defendant first contends that the trial court erred in refusing to permit his eyewitness identification expert to testify, and that as a result, he was denied the right to present a defense and should be granted a new trial. Defendant's primary argument is that in denying his motion, the trial court failed to follow this court's decision in People v. Allen, 376 Ill. App. 3d 511 (2007), by carefully scrutinizing the proffered expert witness testimony under the circumstances of this case, where the primary evidence at trial was the eyewitness testimony. We disagree, and find that because the trial court adhered to the holding in Allen as well as Illinois Supreme Court precedents regarding admissibility of eyewitness identification expert testimony, the trial court did not err in refusing to permit the expert witness to testify.

Generally, expert witnesses will be permitted to testify if their experience and qualifications afford them knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. Enis, 139 Ill. 2d at 288. A trial court is given broad discretion when determining the admissibility of expert testimony, and when considering the reliability of the expert testimony, the court should balance its probative value against its prejudicial effect. Enis, 139 Ill. 2d at 290. The court should also consider the necessity and relevance of the expert testimony in light of the facts of the case before admitting it. Enis, 139 Ill. 2d at 290. "[A] trial court's decision to allow or exclude eyewitness identification expert testimony must be made on a case-by-case basis" (Tisdel II, 338 Ill. App. 3d at 468) and such decision will not be reversed absent an abuse of discretion (Enis, 139 Ill. 2d 288).

In Enis, defendant was charged with murder in the stabbing death of a woman inside her

apartment building. The State presented the testimony of seven witnesses who were near the apartment building at the time of the murder and saw defendant outside the building. Our supreme court held that the trial court did not err in barring defendant from presenting an expert witness who would testify about the reliability of eyewitness testimony. The expert would have testified that the relationship between confidence and accuracy in eyewitness identifications is insignificant; that the higher the stress level the less accurate the memory; that an eyewitness identification is usually worse if a weapon is present; and that jurors give too much weight to time estimates. Enis, 139 Ill. 2d at 285. The court found that the expert testimony would not have aided the trier of fact in reaching its conclusion because none of the eyewitnesses was in a high stress situation when they saw defendant. Enis, 139 Ill. 2d at 288. Only one witness testified that he saw a weapon, but he was not near the defendant and he was unaware that a crime had been committed. Enis, 139 Ill. 2d at 288-89. The court also found that there was little relevance to the time estimates, and that although the witnesses' confidence may have been at issue in the case, that factor alone did not warrant a new trial. Enis, 139 Ill. 2d at 289.

The court also issued a word of caution with regard to eyewitness expert testimony, stating, "We are concerned with the reliability of eyewitness expert testimony ***, whether and to what degree it can aid the jury, and if it is necessary in light of the defendant's ability to cross-examine eyewitnesses. An expert's opinion concerning the unreliability of eyewitness testimony is based on statistical averages. The eyewitness in a particular case may well not fit into the spectrum of these averages. It would be inappropriate for a jury to conclude, based on expert testimony, that all eyewitness testimony is unreliable." Enis, 139 Ill. 2d at 289-90.

-12-

Subsequent Illinois cases have held that a trial court may exclude expert testimony on eyewitness identification if the court finds that the testimony is not relevant or would not aid the trier of fact. In Tisdel II, this court noted that numerous studies in the area of eyewitness psychology indicate there is significant potential for eyewitness error, and that jurors have misconceptions about the abilities of eyewitnesses. Tisdel II, 338 Ill. App. 3d at 467. Therefore, we held that a trial court "should carefully scrutinize the proffered testimony to determine its relevance–that is, whether there is a logical connection between the testimony and the facts of the case. Normally, expert testimony that is probative and relevant should be allowed." Tisdel II, 338 Ill. App. 3d at 468 citing People v. Sargeant, 292 Ill. App. 3d 508 (1997).

The defendant in Tisdel II contended that the expert's testimony should have been admitted because it would have aided the jury in reaching a more informed decision as to the credibility of the eyewitness testimony. Because the record showed the trial judge considered the reliability and potential helpfulness of the testimony, balanced the proffered testimony against cases in which courts have upheld the exclusion of such evidence, and found the testimony would not assist the jury, we found that the trial court properly exercised its discretion under Enis. Tisdel II, 338 Ill. App. 3d at 468.

More recently, this court took another look at the issue of the admissibility of expert testimony on the reliability of eyewitness identification in People v. Allen, 376 Ill. App. 3d 511 (2007). In Allen, the State brought several charges against defendant, including attempted murder, following the armed robbery of a dry cleaners. The State had one eyewitness, the store clerk, who was shot in the back and who was shown a photo array after learning that the police

1-08-0015

had someone in custody. She did not identify the defendant in person until more than 3½ years later, during a preliminary hearing while defendant sat at counsel's table in his jail uniform. Following his conviction, defendant argued on appeal that the trial court erred in refusing to grant his request to present the testimony of an eyewitness identification expert. This court agreed and reversed defendant's convictions and remanded to the trial court. Allen, 376 Ill. App. 3d at 526.

In its opinion, the Allen court criticized the trial court for failing to comply with the mandate in Enis and Tisdel II, that a court should " 'carefully scrutinize the proffered testimony to determine its relevance–that is, whether there is a logical connection between the testimony and the facts of the case.' " Allen, 376 Ill. App. 3d at 523 quoting Tisdel II, 338 Ill. App. 3d at 468. Although the balancing test requires a weighing of the probative value against its prejudicial effect, the trial court in Allen did not carefully scrutinize the probative value and relevance of the testimony before concluding, with "no considered basis," that the proposed testimony would confuse the jury. Allen, 376 Ill. App. 3d at 526. "Because of the trial court's failure to conduct a meaningful inquiry into [the expert's] proposed testimony, under the specific circumstances of this case," this court reversed the defendant's conviction and remanded for a new trial. Allen, 376 Ill. App. 3d at 526. The court, however, limited its holding, stating that it was not expressing an opinion on whether the trial court on remand should allow any part of the offer of proof to be heard by the jury, but was "simply hold[ing] the offer of proof must be given serious consideration." Allen, 376 Ill. App. 3d at 526.

Further, in scrutinizing the proffered testimony "in the context of the factual posture of the case," this court found that although some of the data and conclusions in the expert's report did

-14-

not fit the facts of the case, other parts of the report were relevant and refer to commonly accepted misconceptions. Allen, 376 Ill. App. 3d at 524. For instance, the proposed expert's report in Allen presented data concerning weapon focus, stress, and the relationship between witness confidence and witness accuracy, issues that the State stressed in closing argument. Allen, 376 Ill. App. 3d at 524-25.

Defendant asserts that based on this court's holding in Allen, the trial court should have permitted the eyewitness expert to testify. We disagree. First, in this case, unlike in Allen, the trial court adhered to the holdings in Enis and Tisdel II requiring careful scrutiny of the proposed expert testimony on eyewitness identification. The trial court heard respondent's motion before trial and based on the proffered testimony and appropriate case law, concluded that the expert testimony would be more prejudicial than probative and would be confusing to the jury. When the defendant filed a motion to reconsider, the trial court conducted a second hearing and again reviewed the proffered testimony in light of the facts before it and appropriate case law, including the holding in Allen, and determined that it was not admissible. Therefore, the trial court gave the proffered testimony the scrutiny called for in Allen before determining that it was not relevant and would not assist the jury.

This finding is similar to the conclusions reached in In re Keith C., 378 Ill. App. 3d 252 (2007) and People v. Thomas, 377 Ill. App. 3d 950 (2007), which were issued shortly after Allen and found that the trial courts did not err in excluding eyewitness expert testimony. In each case, this court found that because the trial court gave the proffered expert testimony the serious consideration called for in Allen, they did not abuse their discretion in refusing to admit the

testimony. In re Keith C., 378 Ill. App. 3d at 264 ("Allen reinforces our conclusion as to the admissibility of [the expert witness's] proposed testimony. *** [U]nlike the trial court in Allen, the trial court in this case gave the proposed testimony serious consideration before it determined that it was not relevant.") and Thomas, 377 Ill. App. 3d at 961 (citing Allen in concluding that in the bench trial "the trial court clearly gave serious consideration to the admission of the expert testimony."). Likewise in the instant case, the trial court gave the requisite consideration to the proposed expert testimony before concluding that it was not relevant and would not help the jury.

Furthermore, in reviewing the proffered expert testimony, we find that the trial court did not err in concluding that it should be excluded. As the trial court noted, unlike in Allen, where the one eyewitness identified defendant 3½ years after the incident, in this case two eyewitnesses identified defendant within 24 hours of the shooting and the third eyewitness picked defendant from the photo array but stated that he would have to see the suspect in person to be sure. Given that defendant was positively identified so soon after the incident, the trial court correctly found that expert testimony concerning the passage of time between the incident and the accuracy of an eyewitness identification would not be relevant.

Defendant's expert witness would also have testified regarding the lack of correlation between the certainty with which a witness makes an identification and the validity of that identification. However, as the trial court noted in its first hearing on the motion, although two of the eyewitnesses testified that they were certain that the man they identified in the photo array was the shooter, one of the witnesses, Dominic Pettis, stated that he was not certain and wanted to view the suspect in person before identifying him as the shooter. Therefore, this testimony

would not be relevant to the reliability of Pettis's testimony and could, as the trial court concluded, result in jury confusion.

Lastly, the expert witness would have testified on the effects of stress and the presence of weapons on eyewitness identification. The trial court found that these effects were "pure speculation" and would not assist the jury in determining the accuracy of the eyewitness identifications. The Enis court found that such testimony was not admissible where none of the eyewitnesses was in a high stress situation and only one saw a weapon but he was far away and unaware that a crime had been committed. Enis, 139, Ill. 2d at 288-89. In the present case, due to the circumstances of the shooting it is likely that the eyewitnesses were under stress and all three testified that they saw a weapon. However, this factor alone, when weighed against the fact that three eyewitnesses identified defendant and two did so within 24 hours of the shooting, does not warrant a new trial.

Following the standards set forth in Enis, Tisdel II and Allen, the trial court considered the proffer by the defense before excluding the eyewitness expert testimony on the grounds that it would be more prejudicial than probative and could lead to jury confusion. Therefore, the trial court did not abuse its discretion in refusing to admit that testimony.

Next, defendant asserts that the trial court erred in admitting evidence surrounding his arrest. Prior to trial, the court granted the State's motion to present evidence of the circumstances of defendant's 2006 arrest in order to show consciousness of guilt. Before testimony about the arrest was presented, the judge asked defense counsel if he wanted the court to instruct the jury regarding the limited purpose of the testimony, but defense counsel declined,

stating that it was already in the instructions and that he preferred it not be pointed out to the jury. On appeal, defendant argues that the trial court erred in permitting this evidence because it was not relevant to the first degree murder charge and was offered to show that defendant was armed and reckless and only served to prejudice the jury against him.

Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes. People v. Wilson, 214 Ill. 2d 127, 135 (2005). For instance, evidence of other crimes is admissible to show consciousness of guilt (People v. Hawkins, 326 Ill. App. 3d 992, 997 (2001) citing People v. Bean, 137 Ill. 2d 65, 107-08 (1990)) and to show the circumstances surrounding defendant's arrest. (People v. Coleman, 158 Ill. 2d 319, 335-36 (1994)). " 'When such evidence is offered, it is incumbent upon the trial judge to weigh the relevance of the evidence to establish the purpose for which it is offered against the prejudicial effect the introduction of such evidence may have upon the defendant.' "  People v. Harris, 225 Ill. 2d 1, 28 (2007) quoting People v. Stewart, 105 Ill. 2d 22, 62 (1984).  Evidence of flight and the use of an assumed name may be admissible as proof of consciousness of guilt. Harris, 225 Ill. 2d at 23.  "The admissibility of other-crimes evidence rests within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of discretion." Wilson, 214 Ill. 2d at 136.

Contrary to defendant's assertion that testimony regarding defendant's 2006 arrest was only offered to show character and propensity to commit a crime, the evidence was properly admitted to show defendant's consciousness of guilt.  Evidence was presented showing that the police went to defendant's house immediately after the shooting and told his mother and brother

that they were looking for him and that the police continued to look for him at his house and in his neighborhood over the next two years. Therefore, it is likely that defendant knew that he was wanted by the police. When he was stopped by the police, defendant gave a false name and then fled from the scene, leading the police on a car chase and then fled on foot. When defendant was subsequently apprehended, he again gave the police a false name and address. As our supreme court held in Harris, "both evidence of flight and the use of an assumed name may be admissible as proof of consciousness of guilt." Harris, 225 Ill. 2d at 23. After a hearing on the issue, the trial court determined that although the evidence might not be admissible to show the circumstances of defendant's arrest, it was relevant to show consciousness of guilt. The trial court did not abuse its discretion in admitting the evidence for that purpose.

Defendant next argues that the State failed to prove him guilty beyond a reasonable doubt, where the only evidence against him was the testimony of three eyewitnesses, whose testimony was inconsistent with each other's testimony and with known facts. The State asserts that the three eyewitnesses clearly, consistently, and repeatedly identified defendant as the shooter, and when the evidence is viewed in a light most favorable to the State, the defendant was proved guilty beyond a reasonable doubt.

"When [a defendant] challenge[s] the sufficiency of the evidence, it is not the function of this court to retry the defendant." People v. Hall, 194 Ill. 2d 305, 329-30 (2000). A reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Evans, 209 Ill. 2d 194, 209 (2004). Where the finding of the

defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. People v. Cunningham, 212 Ill. 2d 274, 279 (2004). Under this standard, the eyewitness testimony may be found insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." Cunningham, 212 Ill. 2d at 280. A criminal conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. Hall, 194 Ill. 2d at 330. In reviewing the evidence, the court will not substitute its judgment for that of the trier of fact. People v. Sutherland, 223 Ill. 2d 187, 242 (2006).

Defendant asserts that the eyewitnesses' testimony is not reliable because the shooting took place in a park at night without natural light and because the witnesses did not know the offender, did not describe any of defendant's physical characteristics, and did not have ample opportunity to view him since the event happened in a matter of seconds. In addition, defendant asserts, two years lapsed between the shooting and the physical lineup.

Although the shooting did occur in a park at night, the evidence presented showed that the park was well lit, and it is not unreasonable to assume that the jury could conclude that under those circumstances a positive identification could be made. In addition, although defendant argues that the witnesses' failure to describe defendant's physical characteristics, such as facial hair or tattoos, makes their identification of defendant unreliable, each eyewitness separately described the shooter as a male, Hispanic teenager who had a bald head and ponytail and was wearing a red T-shirt. Based on these descriptions, which each eyewitness repeated on several

-20-

occasions, it would not be unreasonable for a fact finder to accept the eyewitnesses' testimony as true beyond a reasonable doubt.

Defendant also asserts that inconsistencies between the witnesses and inaccuracies in their testimony make them unreliable. For instance, defendant asserts that Pettis testified that he immediately selected defendant in a photo lineup, while the lead detective said he did not. Pettis testified that he picked defendant out from the photo lineup the day after the shooting, but said that he would need to see him in person to be sure. Pettis subsequently identified defendant in the physical lineup. Detective Hladik essentially said the same thing, therefore, their testimony was not inconsistent.

With regard to Villarreal's testimony, defendant asserts that he described the shooter as 5 feet 5 inches, even though defendant is 6 feet tall. However, Villarreal actually described the shooter as being between 5 feet 5 inches and 5 feet 7 inches and that was two years before defendant, who was a teenager at the time of the incident, was arrested. Defendant also asserts that Villarreal, unlike the other witnesses, said that he never saw a gun, but Villarreal actually testified that he only saw the handle of the gun and, therefore, could not identify what type of gun it was. Further, defendant asserts that Villarreal said that he knew Bryson, while Bryson testified that he met everyone for the first time that night in the park. However, Villarreal said that he saw Bryson on special occasions at McClelland's house, and it would not be unreasonable for a jury to conclude that Villarreal did not remember meeting Bryson. Lastly, defendant asserts that Villarreal stated that he pled with the shooter not to shoot them but that no one else heard him do that. However, Bryson did testify that in the middle of the gunshots, he heard Villarreal saying

"Come on, come on, come on." In addition, given that the witnesses were all running away in different directions, it is not unreasonable to conclude that they might not have heard Villarreal.

All of these alleged inconsistencies, as well as possible impediments to the witnesses' identifications of defendant, were before the jurors, who had the opportunity to consider them in reaching their verdict. In reviewing all of the evidence in accord with the standard set forth above, a rational trier of fact could have found defendant's guilt beyond a reasonable doubt. Accordingly, we reject defendant's assertion that the State failed to prove him guilty beyond a reasonable doubt.

Lastly, defendant contends that the trial court abused its discretion in sentencing him to 50 years' imprisonment. The sentencing range for murder is 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a)(West 2006). However, if during the commission of the offense the offender personally discharges a firearm "that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(iii)(West 2006). In this case, the trial court sentenced defendant to 25 years on the first degree murder conviction and added 25 years for the use of a firearm during the offense. Defendant argues that the sentence is excessive because the trial court failed to consider relevant factors in mitigation as well as defendant's age and rehabilitative potential. We disagree.

The trial court is vested with wide discretion in sentencing, however, such discretion is not without limitation. Supreme Court Rule 615(b)(4) grants the reviewing court the power to reduce the sentence imposed by the trial court. 134 Ill. 2d R. 615(b)(4). The rule itself, however,

does not set forth the scope of this power or the circumstances under which it should be exercised. Rather, decisions of our supreme court have established that, absent an abuse of discretion by the trial court, the sentence may not be altered on review. See, e.g., People v. Stacey, 193 Ill. 2d 203, 209-10 (2000); People v. Hauschild, 226 Ill. 2d 63, 90 (2007). For example, a sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. People v. Fern, 189 Ill. 2d 48, 54 (1999).

Because defendant offers no evidence, aside from the sentence itself, that the trial court failed to consider the mitigating evidence we may assume that the trial court properly considered it. See People v. Jarrell, 248 Ill. App. 3d 1043, 1051 (1993) (a trial court need not articulate the process by which it determines the appropriateness of a given sentence). Further, the record shows that the trial court did not ignore mitigating factors in defendant's favor. The record shows that before sentencing, the trial court read the presentence report, which included factors such as the defendant's personal history, education, and social environment. The trial court considered defendant's age and his prior criminal history as a juvenile, noting that "he's not exactly a novice in the system, but not exactly a hardened, longtime criminal either." The court also considered the seriousness and senseless nature of the crime that resulted from a question about gang involvement. For these reasons, the trial court did not abuse its discretion by imposing a 50 year sentence, which was within the statutory limits that called for a sentence of between 45 years and life imprisonment.

1-08-0015

Defendant also argues that the imposition of a 25 year sentence enhancement violated the principles articulated in Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because the verdict form returned by the jury did not contain a finding that defendant personally discharged a firearm during the offense. In Apprendi, the Supreme Court held that the facts that increase the prescribed penalties for an offense must be submitted to a jury and proven beyond a reasonable doubt. Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. In the instant case, based on Illinois Pattern Jury Instructions, Criminal, No. 7.02 (4th ed. 2000), the jury was specifically instructed that in order to find defendant guilty of the offense of first degree murder, it would have to find that the State proved beyond a reasonable doubt:

"First: That the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Brandon McClelland by personally discharging a firearm that proximately causes death; and

Second: That when the defendant did so, he intended to kill or do great bodily harm to Brandon McClelland;

or

he knew that his acts would cause death to Brandon McClelland;

or

he knew that his acts created a strong probability of death or great bodily harm to Brandon McClelland."

The court further instructed the jury that "[i]f you find from your consideration of all the evidence

-24-

that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

After considering the evidence together with these instructions and the arguments by the parties, the jury returned a general verdict finding defendant guilty of first degree murder. The record, including the evidence, the instructions, and the signed verdict form, reflects that the jury found beyond a reasonable doubt that the defendant performed the acts that caused the death of McClelland by personally discharging a firearm. Because the instructions provided to the jury at defendant's trial include the language "personally discharging a firearm" and properly articulated the facts that were required to be proven beyond a reasonable doubt in order to apply the 25-year extension to defendant's sentence, the enhancement did not violate Apprendi.

This finding is consistent with the principles articulated by the Illinois Supreme Court in People v. Hopkins, 201 Ill. 2d 26 (2002). In Hopkins, the defendant was sentenced to an extended term in prison after being convicted of first degree murder, armed robbery, aggravated battery, and home invasion. In its analysis, the court in Hopkins noted that the jury returned a verdict of guilty for the charged offense of aggravated battery and this charge included the fact of the victim's age as an element of the offense. Hopkins, 201 Ill. 2d at 39. Accordingly, the age of the victim was an element proven beyond a reasonable doubt which permitted the trial court to sentence defendant to an extended term sentence. Hopkins, 201 Ill. 2d at 39-40.

Similarly in this case, the fact that defendant caused McClelland's death while "personally

discharging a firearm" was included as a fact that the instruction required the State to prove to the jury beyond a reasonable doubt. In returning its verdict finding defendant guilty of first degree murder, the jury in the instant case found beyond a reasonable doubt that defendant discharged a firearm. Accordingly, there is no Apprendi violation.

## III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

MURPHY, P.J. and COLEMAN, J., concur.