NOTICE
Decision filed 05/19/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 170353-U

NO. 5-17-0353

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 15-CF-446 |
| | ) | |
| CORY OSBORNE, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm this matter, where the defendant invited the error regarding the introduction of the AT&T evidence, and similarly invited error by failing to object to the jury instructions. We find that the defendant forfeited any potential error in the introduction of footwear comparison evidence. While the introduction of the gun evidence was in error, we find that there was no plain error. We further find that the defendant did not receive the ineffective assistance of counsel.

¶ 2    The defendant, Cory Osborne, was convicted of first degree murder, including a sentencing enhancement for personally discharging a firearm that proximately caused the death of the victim, Stacie Williams, after a jury trial. The defendant appeals evidentiary issues regarding the admission of AT&T records, the defendant's prior gun ownership, and expert witness testimony regarding the analysis of shoeprints found at the crime scene. The defendant additionally argues that this court should reverse the defendant's conviction or vacate the defendant's 50-year sentence

1

for personally discharging a firearm, where the jury was given non-standard jury instructions. For the following reasons, we affirm.

¶ 3                    I. BACKGROUND

¶ 4    Stacie Williams was found dead in her car near her home in Granite City, Illinois, at approximately 5:30 p.m. on February 18, 2015. She had been shot in the back of her head. Williams was a 35-year-old mother of three daughters.

¶ 5    A few days prior to Williams's death, she had ended a relationship with the defendant, Cory Osborne. On February 20, 2015, the defendant was charged with two counts of first degree murder, in violation of section 9-1(a)(1) of Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1), (a)(2) (West 2014)), and one count of unlawful possession of weapons by a felon, in violation of section 24-1.1(a) of the Code (*id.* § 24-1.1(a)).

¶ 6                    A. Pretrial Motions

¶ 7    The defendant filed a motion *in limine* regarding shoeprint testimony on February 21, 2017. The defendant sought to prohibit the State from introducing testimony describing shoeprints found at the crime scene as similar to shoes seized from the defendant's residence.

¶ 8    On February 22, 2017, the trial court addressed multiple motions, including the defendant's motion *in limine* regarding shoeprint testimony. The defendant argued that shoeprints were sent to the Illinois State Police crime laboratory for examination, and a positive identification could not be made. Nonetheless, the State wanted to elicit testimony that the shoeprints from the crime scene were similar to shoeprints made from the shoes seized from the defendant's residence. The defendant argued that this testimony would be more prejudicial than probative. The State responded that a witness would testify regarding a single set of shoeprints leading from Williams's car, that the crime scene investigator preserved the shoeprints through photographs, and that an

2

expert in footwear comparison would provide testimony regarding the single set of shoeprints. The State informed the trial court that the expert was expected to testify that there was a unique design common to the bottom of the defendant's shoes, and they were the type of shoe that made the shoeprints found at Williams's house and by her car. The State argued that the jury could consider the weight to be given to the shoeprint evidence, subject to cross-examination. The court denied the motion *in limine*, finding that the probative value was not outweighed by the prejudicial effect of the evidence.

¶ 9    The State had filed a witness disclosure that they intended to call Detective Brian Koberna as an expert witness in the area of digital forensics. The State's witness disclosure also stated that the State intended to call forensic scientist Thomas Gamboe as an expert in the areas of firearms and ammunition identification, tool marking, and footwear comparison. The trial court addressed the State's disclosures at the February 22, 2017, hearing. Sergeant Koberna was present at the hearing and testified to his qualifications as an expert in digital forensics. Sergeant Koberna stated that he would testify at trial to information extracted from the defendant's cellular telephone. The trial court found that Sergeant Koberna had the experience and knowledge to qualify him as an expert in the area of digital forensic analysis. The trial court further stated that a foundation would need to be laid for the information Sergeant Koberna testified to at trial. The court indicated that Gamboe's qualifications as an expert witness would be addressed at trial once the State had laid the proper foundation.

¶ 10                        B. Jury Trial

¶ 11    The jury trial began on March 6, 2017. The State called William Bowen, who lived in Williams's neighborhood, as its first witness. Bowen testified that at approximately 2 p.m. on February 18, 2015, he noticed a car in an empty lot in the alley behind his house. The front of the

3

car was facing his back fence. Bowen then watched television for a few hours until his fiancée asked about the car. He went outside to look at the car and saw that a woman was inside the vehicle. Bowen stated that he never touched the car, but that he yelled at the woman while standing near the car and did not receive a response. Bowen went back inside his house and his fiancée called the police at approximately 5:30 p.m. Bowen testified that there was ankle deep snow on the ground, and he had observed one set of shoeprints in the snow "leading from the back right passenger door." The shoeprints went towards the alley.

¶ 12    The State called Officer Daniel Grayson. Officer Grayson testified that he worked for the Granite City Police Department on the date of the incident and had responded to a call regarding a woman in a vehicle in the alley behind Bowen's residence. When Officer Grayson arrived on the scene, he found a blue Dodge Avenger still running with an unresponsive woman inside. Officer Grayson identified the woman as Williams based on the registration and license plate of the vehicle. Officer Grayson testified that he had noticed two sets of shoeprints near the car. One set of shoeprints approached from the front quarter panel of the vehicle, then went around the front of the vehicle to the passenger side, and in turn, headed back towards Bowen's house. A second set of shoeprints tracked from the passenger side of the vehicle toward the alley and sidewalk. Emergency medical services examined Williams and determined that she was deceased. Officer Grayson secured the scene and contacted the detectives and the coroner.

¶ 13    Aylexus Williams, the 18-year-old daughter of Williams, was also called by the State and testified that two weeks prior to her mother's death, Aylexus was living with the defendant, her mother, and her sisters, Taylor and Arielle, in Granite City, Illinois. Aylexus testified that the defendant had moved out of their home after he "beat my mom up." Aylexus had observed

4

Williams with a black eye and a swollen nose after the incident of domestic violence. Aylexus testified that Williams changed the locks to the house.

¶ 14    Aylexus further testified that on February 18, 2015, she arrived home after school at approximately 1:30 p.m. When she arrived home, her mother was there and was asleep. Her mother left the house at approximately 2:45 p.m. to pick up Taylor from school. About five minutes after her mother left, the defendant let himself into Williams's house at 3:10 p.m. The defendant was looking for Williams. Aylexus was not expecting the defendant and did not believe that he had a key to the residence. Aylexus asked the defendant how he got into their house. The defendant replied, "Don't worry about it; tell your mom I came by." The defendant left through the back door at approximately 3:25 p.m., and about five minutes after that, Aylexus's sister, Taylor, came home from school. Williams did not come back into the house with Taylor. Aylexus tried to call Williams about eight times with no answer, which was unusual. Aylexus had an appointment that day and testified that Williams would have normally made sure she attended. Aylexus never spoke with Williams again.

¶ 15    Aylexus also testified that the defendant was wearing black work boots while at the house. Further, she said that four years prior to Williams's death, the defendant had owned a gun. The defendant had kept the gun in a purple Crown Royal bag on top of a cabinet in the kitchen. Aylexus could not describe the gun.

¶ 16    Taylor Williams, Williams's 17-year-old daughter, also testified to what occurred on February 18, 2015. Taylor testified that Williams picked up Taylor from school, a little after school got out at 3:10 p.m., in a blue Dodge Avenger. On their way home, Taylor overheard Williams talking on the phone about how the defendant was going to drop off the money that he owed her. The defendant had borrowed money from Williams, and he wanted to repay her. Williams was

still on the phone with the defendant when they were pulling up to the house at approximately 3:30 p.m., and Taylor saw the defendant step out of a car located at a stop sign near the alley that ran behind the Williamses' house. The car was "a cream color with a bubble shape to it." The defendant approached Williams's car and was talking to Williams, but as Williams saw the cream car pull off, she told him that he could not stay there, and that he had to go. Taylor asked her mother if she would drop her off at the house to avoid interacting with the defendant. Williams told the defendant that she was going to drop Taylor off at the house and turned into the alley to do so. Taylor got out of the car and went into the house. Williams remained in the car but turned the engine off. Taylor later looked out the window of their house and Williams's car was not there.

¶ 17    Taylor testified that the defendant had moved out of their house after getting into a fight with Williams, after which Williams made him leave. She had seen the defendant with a black gun a few years prior to the murder. Taylor saw the gun when the defendant was living with Williams and her family at a prior residence in Alton, Illinois. The defendant had kept the gun in the kitchen above a counter.

¶ 18    Joshua Williams testified that Williams was his sister. He testified that he had changed the locks at Williams's house after she and the defendant had been in an altercation.

¶ 19    Next, Tamika Evans testified that the defendant moved in with her family in Alton, Illinois, after he had moved out of Williams's home. Evans testified that on February 18, 2015, the defendant arrived at her house shortly after 4 p.m. and left shortly after 5 p.m. Later that evening, Evans discovered, through a Facebook post, that Williams had died. Evans called the defendant and told him about Williams's death. The defendant was not aware of Williams's death and did not know what Evans was talking about. Evans told the defendant that she would look into it and call him back. During Evans's second phone call with the defendant, she told him that the police

6

were looking for him. They discussed that the defendant should turn himself in to the police the following morning because the defendant had been drinking.

¶ 20    Evans testified that on that same evening, between 2 a.m. and 2:30 a.m., police officers came to Evans's house and asked her about a gun. Evans testified that she told the officers that the defendant had not given her a gun, and she allowed the officers to search her home. The police did not find a gun, but they collected two pairs of the defendant's shoes and some of his clothing.

¶ 21    Officer Nicholas Roberts testified that he was an officer with the Granite City Police Department and worked with the nuisance abatement team, which assists the detective division with different assignments. He testified that he was involved with the investigation following the murder of Williams. Officer Roberts further testified that, based on an interview with Joseph Moore, investigators believed that a white Hyundai Sonata, driven by Moore, had been in the Step N Go parking lot, parked at pump five, and that two subjects had gotten out of the vehicle and gone into the business. Officer Roberts stated that he retrieved the video surveillance footage from the Step N Go gas station located in Granite City, Illinois. Officer Roberts testified that the surveillance video depicted February 18, 2015, and showed Moore at the gas station, along with the defendant. Officer Roberts was able to determine from the videos that the white Hyundai Sonata arrived at the Step N Go at 2:57 p.m. and left at 3:01 p.m. Officer Roberts also retrieved surveillance video from Hardee's, located two businesses away from the Step N Go, which also captured the white Hyundai Sonata turning from Route 3.

¶ 22    Sergeant Kenneth Wojtowicz was called by the State and testified that he was employed with the Granite City Police Department. Sergeant Wojtowicz testified that he was trained in computer, cellphone forensics, and cellular record analysis. In response to a search warrant, AT&T provided the defendant's cellular phone records, as well as Moore and Williams's records.

7

Sergeant Wojtowicz testified to the contents of the cellular phone records received from AT&T. The AT&T records included a spreadsheet prepared by AT&T that included the dates and times phone calls were made, the numbers that originated the calls, the numbers that received the calls, the location of the cellular tower used during the calls, and the global positioning system (GPS) locations of the cellular towers. Sergeant Wojtowicz testified that, generally, the nearest cellular tower was used when making a call, but that the tower used was also based on signal strength. During his testimony, on a Google map document, Sergeant Wojtowicz marked the approximate location of various cellular phone towers used by the defendant on February 18, 2015. Sergeant Wojtowicz additionally testified that Williams did not answer her phone after 3:13 p.m. on February 18, 2015.

¶ 23    Sergeant Wojtowicz completed a similar analysis of AT&T records on Moore's cellular phone. At 1:56 p.m., the defendant and Moore's phones began utilizing the same cellular tower in Alton, Illinois. At 2:59 p.m., both the defendant and Moore's cellular phones were utilizing the same cellular tower on West Chain of Rocks Road in Granite City, Illinois. The two cellular phones continued to track together until 4:18 p.m., after which Moore's phone received calls that utilized cellular towers around the area of East Alton and Bethalto, Illinois. Defense counsel cross-examined Sergeant Wojtowicz, utilizing Defendant's Exhibits 1, 1A, 1B, 1C, and 1D, which were all pages from the defendant's cellular phone records provided by AT&T, other than 1A. Defense counsel credited Sergeant Wojtowicz with helping him to prepare his exhibit 1A, which was a visual timeline relative to certain calls contained in the AT&T records and the corresponding times of those calls. Defense counsel introduced group exhibit 1 into evidence and published it to the jury. Defense counsel also pointed out other calls and their times that were contained in the AT&T records introduced by the State.

¶ 24    Joseph Moore testified that he was not close with the defendant. On February 18, 2015, the defendant contacted Moore through Facebook Messenger. The defendant offered Moore $40 for a ride. Moore picked up the defendant in Alton, Illinois, and drove him to Granite City, Illinois, in his cream color Hyundai Sonata. After they arrived in Granite City at approximately 2:58 p.m., Moore stopped for gas. Moore identified himself and the defendant on the surveillance video obtained from the Step N Go gas station in Granite City. Moore testified that, after he and the defendant left the Step N Go, the defendant had given him directions on where to drive. Moore testified that they rode around waiting for someone, and when a blue car that looked like a Chrysler pulled up behind them, the defendant got out of the car and walked toward the blue car. The defendant told Moore to "hit a block while he takes care of his business." Moore assumed that the defendant was selling marijuana. As he drove away, Moore did not watch the defendant. Moore drove around the entire block. After completing the circle, the defendant was standing where he had been dropped off, and the blue car was gone. Moore then drove the defendant back to Alton, Illinois. He testified that on the drive back, the defendant was "relaxing," and that the defendant used his phone a couple of times to call people. Moore never saw the defendant with a gun.

¶ 25    Moore additionally testified that he spoke to the investigating detectives on February 19, 2015, and was not forthcoming. Moore believed that the defendant had been involved in a "drug deal gone bad." However, after learning that Williams had been killed and that the defendant was a suspect, Moore broke down in tears and rode with a detective, showing him the route Moore had taken with the defendant. Moore testified that he had not been aware that the defendant had an intention to harm Williams.

¶ 26    Detective Jeff Donahey, with the Granite City Police Department, testified that he interviewed the defendant during his investigation of Williams's death. Detective Donahey

9

testified that the Granite City Police Department issued a press release on the night of the murder with a photograph of the defendant, indicating that they wanted to speak with him. The details of the manner of Williams's death were not released to the public. After seeing the press release, the defendant called the police department and was picked up to be interviewed by Detective Donahey and Detective Skalsky. Once back at the Granite City Police Department, Detectives Donahey and Skalsky interviewed the defendant. During the interview, which was played for the jury, the defendant recounted what he did on February 18, 2015. The defendant repeatedly denied ever being in Granite City on that day. The detectives never told the defendant that Williams's cause of death was a gunshot wound, where the gunshot was located on her body, nor the caliber of the bullet.

¶ 27    Detective Donahey also met with Moore. Detective Donahey drove with Moore and another detective on the route Moore had taken on February 18, 2015, with the defendant. Moore had dropped the defendant off less than 175 yards from where Williams's body was found. Detective Donahey testified that he had retrieved video footage from a stationary camera at Madison Avenue and 27th Street in Granite City, which was approximately two blocks from the crime scene. Detective Donahey testified that the video footage showed images of Moore's car passing through the intersection at approximately 3:25 p.m.

¶ 28    Joshua Easton, a crime scene investigator with the Illinois State Police, testified that he had taken photographs of the crime scene. Included in those photographs were photographs of a shoeprint impression in the snow at the intersection of 25th and Madison, near where Williams's car was found. Easton took additional photographs of the shoeprint after it was sprayed with snow wax to show contrast. Tape lifts and latent prints were taken from Williams's vehicle. Easton also testified that he had recovered a "fired Winchester .22[-]caliber cartridge casing, several cigarette

10

butts and cigars, and a bag in the driver's side door pocket, a cigar from the ashtray, [and] a Monster Energy can from the rear back seat area of the vehicle." The .22-caliber shell casing was recovered from the front passenger floorboard. Easton testified that the location of the casing meant that the weapon had been discharged from inside of the vehicle or close to the vehicle with the doors open. Easton additionally had collected a cigarette butt from Williams's residence, as well as photographs of footwear impressions at that location. He also photographed and collected evidence during Williams's autopsy. Finally, he had collected evidence from Moore's vehicle.

¶ 29    Thomas Gamboe was proffered as an expert in the areas of firearms and footwear identification. Gamboe testified that he was employed by the Illinois State Police as a forensic scientist and had prepared a firearms report and a footwear report for this case. Gamboe testified that the shell casing was a Winchester brand and was either a ".22 long or a .22[-]long rifle caliber discharged cartridge case." Gamboe testified that no gunshot residue was found on the defendant or on the defendant's clothing. Gunshot residue, however, was not expected to be found on the shooter's clothing from a semiautomatic weapon unless the firearm was held close to the shooter. Further, the defendant had showered prior to the gunshot residue sample being taken.

¶ 30    Gamboe also testified to the shoeprint comparison analysis he conducted for this case. He testified that he had received a pair of the defendant's Nike Air Jordans and a computer disk with photographic images of shoeprints left in the snow. Gamboe generally explained how a footwear examination was conducted. He used a shoeprint worksheet to determine the brand, model, and size of the shoes, and then he would imbed a photograph of the sole of the shoe on the worksheet. The worksheet would also include other evidence, such as images received and descriptions of the evidence.

11

¶ 31    Gamboe explained that, when making a comparison of the shoe to the images received, he would look for class characteristics of the out sole pattern or design, which is the design on the bottom part of the shoe that we walk on. Gamboe testified that "[i]f they're similar, then I know that there's a chance that the shoes could have made those impressions." Gamboe then testified that he would make test prints of the shoes in evidence and overlay prints made from the photographic images of the shoeprints from the scene for a comparison. Gamboe explained that he does this to determine if there are "individual or identifying characteristics which would make the shoes unique" such as "scuffs, cuts, breaks in the pattern that have occurred over the use/over the wear of the time that the shoe's been in use by the individual." When such features are not present in the comparison, then the shoes cannot be eliminated as the shoes which made the impression, but they also cannot provide a positive identification.

¶ 32    Gamboe testified that the medium used for the comparison in this case was "not very good" because it was difficult to take a good photograph of a shoeprint in the snow. It was also difficult to cast shoeprints in the snow because the wax used to cast the shoeprints clumps when it is cold, causing dents to form, which can deform the impression. Gamboe further stated that a casting created by pouring dental stone over the impression is also difficult to create in snow because the dental stone can cause the snow impression to melt.

¶ 33    Despite those issues, Gamboe used the photographs that he had received to perform a comparison of the shoes in evidence. Five shoeprint impressions from the snow were photographed. Gamboe made test prints with the defendant's shoes that he received and created an overlay for the photographs to look for class characteristics and individual identifying characteristics. He testified that four of the shoeprint impressions had a similar out sole pattern, size, and design. Gamboe explained that there was a teardrop shape in the middle of the heel area

12

and rectangular designs around the perimeter. He additionally explained that "these shoes are really unique in that from about the arch area all the way to the heel they're basically the same." The photographic shoeprints from the snow had the same class characteristics as the defendant's shoes. Then the following testimony took place:

"MS. UHE [(ASSISTANT STATE'S ATTORNEY)]: So what is your opinion as far as the comparison that you made?

GAMBOE: The footwear impressions depicted on the photographs could have been made by these shoes. However, I could not make an identification.

THE STATE: And is that because of those individual characteristics you were talking about?

GAMBOE: Yes. There's just a lack—lack of individual identifying detail."

¶ 34    On cross-examination, Gamboe testified that the defendant's shoes were Nike Air Jordans, which are a popular, widely distributed shoe. Gamboe also testified that he had prepared a report with his findings when he conducted the examination of the shoes and made the comparison to the photographic images. In response to questioning by the defendant's attorney, Officer Gamboe indicated that he had reported that "no identification" could be made in three of the five impressions included in his report. The fourth comparison had insufficient detail to make a comparison and the fifth impression was "totally dissimilar."

¶ 35    Sergeant Koberna testified that he worked in the department's digital forensic laboratory. Sergeant Koberna had conducted a consensual forensic search of the defendant's phone. Sergeant Koberna read a series of text messages between the defendant and Williams regarding their break-up and Williams loaning money to the defendant. Sergeant Koberna testified that, after some back and forth, the defendant had sent a message to Williams on February 14, 2015, at 1:19 p.m. The

concluding message from Williams, that was sent on February 14, 2015, at 1:53 p.m., stated: "I will always love you n b your friend also but it's not as hard for me right now because I haven't been happy for a while and then you beat the last lil love I had in me out of me s-m-h."

¶ 36   Sergeant Koberna testified that seven minutes after the defendant's last message was sent, the defendant used his phone to access the internet. Sergeant Koberna stated that he had rebuilt the webpages that the defendant accessed in order to observe the defendant's internet activity. Sergeant Koberna testified that the defendant viewed a webpage with a title "do you need to have the murder weapon in order to make an arrest." The defendant then searched, "what evidence do the State need to find you guilty of murder." Later that evening, the defendant searched "how long do the police investigate a crime for until they consider it a cold case?" and "how do they police investigate a murder in the first." On February 15, at 9:07 a.m., the defendant continued to search, typing into a web browser "what types of evidence does the prosecutor need to convict a person of attempted murder," followed by "what evidence the prosecutor [*sic*] need to convict you on murder."

¶ 37   Sergeant Koberna stated that he had also created a timeline of the defendant's phone activity that took place on February 18, 2015, the day of the murder. Sergeant Koberna testified that the defendant had made repeated calls to a cab company and sent text messages to Williams and a woman named Julianne, throughout the morning. One message to Williams said, "I got that money for you, Babe, l-y." At 1:29 p.m., the defendant sent Williams a text message that said, "You still at your appointment, Babe?" Williams responded that she was home and about to take a nap. The defendant then sent a text message to Williams that said, "seeing if you wanted to get this 40, Babe." Williams responded, "I don't want to drive that way, period, period, period, no. Maybe I'll get it tomorrow." The defendant responded, "I can bring it to you." Williams asked the

14

defendant to hold the money until she could get it, and the defendant asked if he could still see Williams that day. There was no response from Williams to that question.

¶ 38 Sergeant Koberna testified that after the text exchange with Williams, the defendant called Moore multiple times and sent text messages requesting a ride. The defendant also called a cab company. At 2:19 p.m., Moore replied, "be there in 10" in response to a message from the defendant that stated, "What up, I need that ride, Cuz, ASAP, S'up." At 3:13 p.m., the defendant called Williams's phone. At 3:35 p.m., the defendant called Aylexus, who responded via text message at 3:36 p.m. that she was "in a meeting."

¶ 39 Sergeant Koberna went on to testify that at 6:07 p.m., the defendant searched the internet for information on .22-caliber handguns. He searched "what damage can a .22[-]caliber handgun cause at point-blank range." A minute later, the defendant searched "can a shot from a .22 handgun in the head kill someone." The defendant accessed an internet page by clicking on one of the search results that said, "yes a .22 will kill you." Next, Koberna testified that the defendant accessed an internet page that stated, "what can I kill with a Ruger 10/22." At 6:20 p.m., the defendant again searched "can a .22[-]caliber pistol kill a person with one shot to the head." Sergeant Koberna concluded his testimony by stating that a selfie of the defendant was taken during the timeframe of the internet activity, on the phone he conducted the search on.

¶ 40 Dr. Gershom Norfleet, a forensic pathologist that performed Williams's autopsy, testified that Williams's cause of death was a "gunshot wound of the head and neck." The manner of her death was "homicide." The State rested after Dr. Norfleet's testimony.

¶ 41 The defendant moved for a directed verdict. The defendant argued that, based on the testimony and exhibits, the timeline would not have allowed for the defendant to have committed the crime. The State argued that there was overwhelming evidence that the jury could find, beyond

15

a reasonable doubt, that the defendant was in Granite City at the time of Williams's death and that the defendant committed the offense. The trial court denied the defendant's motion.

¶ 42    The defendant called Carter Burford, with the Granite City Police Department, as his first witness. Burford was involved in the investigation of Williams's death. He testified that he had obtained video surveillance footage of the defendant and Williams entering a Super 8 Motel together on February 16, 2015. Next, the defendant presented a witness from the Madison County circuit clerk's office. The testimony revealed that Williams had never filed an order of protection against the defendant.

¶ 43    Jennifer Endres, with the Metro East Forensic Science Laboratory, testified that she analyzed fingerprints lifted from the passenger door of Williams's car, and that none of the fingerprints matched the defendant. Endres stated that she had not been provided with the .22 casing to determine if a fingerprint could be raised off of the cartridge. Endres testified that she could not determine whether the defendant had been in Williams's car.

¶ 44    Suzanne Kidd, with the Illinois State Police at the Metro East Forensic Science Laboratory, testified that she had performed a DNA analysis on samples from the cigar, knit cap, and cigarette butt found on Williams's driveway, and also on the cigar and cigarette butts found in Williams's car. According to Kidd, there was not enough DNA present on the knit cap to complete a profile, and the defendant's DNA was not found on any of the items tested. A partial male DNA profile matched the cigar and cigarette butt samples found in Williams's car. The defendant was excluded as a possible source of that profile.

¶ 45    Michaelesha Wyatt, a neighbor, testified that on February 18, 2015, she saw a Dodge Avenger running in a yard. She did not see anyone near the car, but she saw a tall, black, heavy-set man wearing a black skull cap and a black jacket walking on the sidewalk. Her mother had

encouraged her to report what she had witnessed to the police. Wyatt testified that she told the police that she saw the man around the time that kids get off the school bus. Defense counsel questioned her as to whether she told police, when questioned near the time of the murder, that she saw the man at 4:40 p.m., and she admitted that she may have.

¶ 46    The coroner, Deborah Brown Von Nida, testified that Williams was pronounced dead at 6:03 p.m. on February 18, 2015. Rigor mortis was not noted in her report.

¶ 47    Ellen Chapman, a forensic scientist with the Illinois State Police Forensic Science Center in Chicago, testified that she did not find any gunshot residue on the cuffs of the black hooded sweatshirt that she tested. Chapman testified that she had tested the defendant's hands for gunshot residue, and none was present; however, due to the time that had passed between the murder and the test, as well as the defendant having showered, she would not expect to find gunshot residue. Chapman testified that she observed tape lifts from four different areas of Williams's vehicle and found that none of the hairs collected were suitable for DNA analysis. Chapman additionally testified that she was not able to detect gunshot residue on the defendant's clothing.

¶ 48                              C. Jury instructions

¶ 49    The State submitted multiple jury instructions, including an instruction labeled "IPIC 7.01" which stated:

> "A person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual; or he knows that such acts create a strong probability of death or great bodily harm to that individual."

The State also submitted an amended instruction labeled "IPIC 7.02" which stated:

> "To sustain the charge of first degree murder, the State must prove the following propositions:
>
> *First Proposition*: That the defendant personally discharged a firearm and shot Stacie Williams which caused the death of Stacie A. Williams; and

17

*Second Proposition*: That when the defendant did so, he intended to kill or do great bodily harm to Stacie A. Williams; or he knew that his acts created a strong probability of death or great bodily harm to Stacie A. Williams.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

The jury was also provided with two blank verdict forms to complete, depending on whether the jury found the defendant guilty or not guilty of first degree murder. The jury was not provided with any of the Illinois pattern jury instructions[1] or special verdict forms on sentencing enhancements. Defense counsel did not object to these instructions.

¶ 50    After the jury received the instructions, they deliberated and returned a verdict of guilty of first degree murder. The jury was polled and affirmed the verdict, and the trial court entered a verdict of guilty of first degree murder along with a finding that the defendant personally discharged a firearm resulting in the death of Williams.

¶ 51                              D. Posttrial Motions

¶ 52    The defendant filed a posttrial motion arguing that the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt. The defendant additionally argued that the trial court erred in denying portions of the defendant's motion *in limine*, by (1) allowing Sergeant Koberna to testify to messages from Williams's phone and (2) allowing Gambo to testify that the shoes seized from the defendant were similar to the shoeprints in the snow by Williams's car and house. Further, the defendant argued that the trial court erred by sustaining the State's objection

_____

[1]See IPI Criminal 28.01 *et seq*. (approved July 18, 2014).

18

during closing argument that Williams could have provided the defendant with a key to her house. The defendant further argued that the prosecution improperly shifted the burden of proof to the defendant, and that the cumulative effect of errors committed during the trial deprived the defendant of a fair trial. After hearing argument on the matter, the trial court denied the defendant's motion.

¶ 53    The defendant was sentenced to 50 years' imprisonment for first degree murder. The trial court also sentenced the defendant to 50 years' imprisonment based on the finding that the defendant personally discharged a firearm, for a total of 100 years' imprisonment, to be served at 100%.

¶ 54    The defendant filed a motion to reconsider the sentence on May 17, 2017. The defendant argued that the trial court did not properly weigh the factors in mitigation, gave undue weight to the factors in aggravation, and that the sentence was excessive. The court heard, and denied, the defendant's motion on September 7, 2017. This appeal followed.

¶ 55                                II. ANALYSIS

¶ 56    On appeal, the defendant argues that cumulative trial errors, including the admission of AT&T cellular records, the alleged improperly elicited evidence about a gun, and the alleged improper expert testimony regarding footwear analysis, prejudiced the defendant. The defendant additionally argues that he was denied his right to a fair trial where the jury was given non-standard jury instructions regarding the applicable sentencing enhancement, that the defendant personally discharged a firearm in the commission of the offense. As a result of the alleged errors, the defendant also alleges that he received ineffective assistance of counsel.

¶ 57                              A. Evidentiary Issues

¶ 58    First, we will address the defendant's argument that a combination of errors resulted in the defendant being denied a fair trial, and that he was denied the effective assistance of counsel. We will address the defendant's issues on appeal in turn; however, based on the following analysis, we cannot agree that cumulative errors denied the defendant a fair trial or the effective assistance of counsel. A trial court's determination on the admission of evidence will not be disturbed absent an abuse of discretion. *People v. Shum*, 117 Ill. 2d 317, 353 (1987).

¶ 59                                 1. AT&T Records

¶ 60    The defendant argues that the State should not have been allowed to introduce AT&T records and testimony about those records to establish the locations of the defendant, Moore, and Williams's phones at certain times based on cellular tower data. The defendant argues that such evidence lacked foundation, was hearsay, and Sergeant Wojtowicz was not qualified to discuss the AT&T records. The records were admitted in the form of spreadsheets prepared by AT&T, both on discs and in printed form, for the defendant, Moore, and Williams's phones (AT&T records).

¶ 61    The Illinois Rules of Evidence govern the admissibility of evidence at trial. *People v. Brand*, 2021 IL 125945, ¶ 36. Hearsay evidence is defined as an out-of-court statement offered in court to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay evidence is inadmissible unless the rules provide an exception, such as business records kept in the regular course of business activity. Ill. R. Evid. 802 (eff. Jan. 1, 2011); Ill. R. Evid. 803(6) (eff. Apr. 26, 2012). For business records to be admissible, they still must be authenticated, requiring the proponent to present some evidence that the business record is what it purports to be. Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). Some records are self-authenticating, meaning extrinsic evidence is not necessary to authenticate the record. *People v. Thomas*, 2022 IL App (4th) 210538-U, ¶ 10.

20

For those records, the proponent may produce a written certification along with the records, averring that the record meets the foundational requirements of Illinois Rule of Evidence 902(11) (eff. Jan. 1, 2011). In the present case, the cellular phone records were also subject to a prior version of Illinois Rule of Evidence 902(12) (eff. Jan. 1, 2011), relating to records generated by an electronic process or system. Rule 902(12) included additional foundational requirements for computer-generated records. While the State disagrees that the additional foundational requirements were necessary here, the State concedes that even the lesser foundational requirements were not met in the introduction of the AT&T records. As such, the State concedes the error; however, the defendant failed to object to the introduction of the AT&T records. The defendant also failed to object to the opinion testimony of Sergeant Wojtowicz regarding the AT&T records and failed to include either issue within his posttrial motion.

¶ 62    The defendant acknowledges that he did not object to the introduction of the AT&T evidence or testimony, and further acknowledges that he failed to raise the issues in a posttrial motion. Such failure operates as a forfeiture of the right to raise the issues as grounds for reversal on review. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). The defendant urges this court, however, to review these evidentiary issues under the plain-error doctrine, which provides a narrow and limited exception to the forfeiture rule. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). The plain-error doctrine may be applied as an exception to the forfeiture rule where the record clearly shows that an alleged error affecting substantial rights was committed or where the error occurs in a case in which the evidence is closely balanced. *Thompson*, 238 Ill. 2d at 613.

¶ 63    Plain-error review, however, is forfeited when the defendant invites the error. *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17. When a party procures, invites, or acquiesces in the admission of evidence, even where the evidence is improper, that party cannot contest the

21

admission on appeal. *People v. Caffey*, 205 Ill. 2d 52, 60 (2001); *People v. Harvey*, 211 Ill. 2d 368, 386 (2004).

¶ 64    Here, when the State sought to admit the AT&T records, along with printed paper copies from the disks, defense counsel responded: "No objection." Not only did the defendant not object, but the defendant's theory of the case rested largely on the AT&T records and the concomitant testimony of Sergeant Wojtowicz. During opening statements, defense counsel stated that, during the investigation, Wyatt told the Granite City Police that she saw a "big black man" walking away from Williams's car, and that it was around 4:40 p.m. Defense counsel went on to state to the jury that:

> "[T]he evidence is going to show based on cellphone data that [the defendant] is leaving the area about 3:23, when [Moore] picks him up. Therefore, I think that if you listen to the facts, examine the facts, it's going to show that based on the State's own expert witnesses they talked about, he couldn't have done it. He was not in the area at the time that the murder probably occurred."

¶ 65    The defendant utilized portions of the AT&T records, and an exhibit he created therefrom, with the help of Sergeant Wojtowicz. These were used to aid in proving his theory that the AT&T records proved the defendant could not have committed the murder based on the timeline established by Wyatt. During cross-examination, defense counsel admitted defendant's group exhibit 1, consisting of defendant's exhibits 1A, 1B, 1C, and 1D. The defendant's exhibit 1A was a timeline that defense counsel made, with help from Sergeant Wojtowicz, plotting the times and cellular tower locations of the defendant's phone on the day of the murder. Defendant's exhibit 1A was based on the AT&T records that the defendant now complains were admitted in error. Defendant's exhibits 1B, 1C, and 1D were identified as pages 6, 7, and 8 of the defendant's AT&T

22

phone records, where defense counsel had highlighted specific phone activity. Defendant's group exhibit 1 was published to the jury.

¶ 66    During closing arguments, defense counsel relied on the AT&T records and Sergeant Wojtowicz's testimony to define a timeline that he asserted proved that his client could not have committed the murder. Defense counsel pointed out that, according to Moore's testimony and the cellular tower data, Moore picked the defendant up at 3:23 p.m., at the intersection by Williams's house. Defense counsel then pointed to the State's video exhibit from a camera mounted at the intersection of 27th and Madison in Granite City, which showed the defendant and Moore traveling in a direction that would be away from Williams's house at 3:25 p.m. and 21 seconds. Defense counsel argued that, based on traffic conditions at the time, and "hard times" confirmed by digital technology, there was no way for the defendant to have committed the murder. As the defendant used the AT&T records and concomitant testimony as a basis of his defense, any error in the admission of the same was an invited error by the defendant. Because the admission of the evidence was invited error, we need not entertain plain-error analysis. *Harding*, 2012 IL App (2d) 101011, ¶ 17.

¶ 67    A forfeited issue may also be addressed as a matter of ineffective assistance of counsel, and the defendant requests that we do so here. While we found that the defendant invited the alleged errors, his challenge may still be presented as a claim for the ineffective assistance of counsel. *People v. Bowens*, 407 Ill. App. 3d 1094, 1101 (2011); *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001).

¶ 68    To prevail on a claim of ineffective assistance of counsel, it must be shown both that (1) counsel's performance fell below an objective standard of competence, and (2) counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687

23

(1984). To establish prejudice, a defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

¶ 69    To show error, the defendant must overcome a presumption that counsel's conduct was the product of a sound trial strategy. *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009). Trial counsel's decision to object to testimony is generally a matter of trial strategy that is entitled to great deference and does not necessarily establish deficient performance. *People v. Perry*, 224 Ill. 2d 312, 345 (2007). A reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance based on his perspective at the time of trial, rather than through the lens of hindsight. *Id.* at 344.

¶ 70    In order to find that it was error to admit the AT&T records and Sergeant Wojtowicz's testimony regarding the same, we would have to conclude that their inclusion was not part of defense counsel's reasonable trial strategy. For the reasons discussed above, we believe that their inclusion was trial strategy, and we further find that such strategy was reasonable.

¶ 71    Here, the State sought to introduce the AT&T evidence to establish that, despite the defendant's protestations during his police interviews, he was in Granite City, and traveled a general route at certain times on the day Williams was murdered. Assuming that defense counsel would have been successful in excluding the AT&T evidence and the concomitant testimony, other evidence would have established that the defendant was located in Granite City, with Williams, at the time of the murder. Evidence that was not excluded demonstrated that on the day of the murder, Moore picked up the defendant and dropped the defendant off for a period of time near Williams's car and picked the defendant up at the same location thereafter. Both Aylexus and Taylor testified that they saw the defendant in Granite City on the day that Williams was murdered, and neither

24

Taylor nor Aylexus could reach Williams after she was last seen speaking with the defendant. All of this occurred between 3 p.m. and around 3:30 p.m.

¶ 72    The only additional evidence established by the AT&T records were times of various phone calls and the locations of the cellular towers utilized for those phone calls. Defense counsel argued to the jury that the timeline established by the AT&T evidence ruled out the defendant as the perpetrator of Williams's murder.

¶ 73    Michaelesha Wyatt testified that she saw a large black man walking away from Williams's vehicle around the time that school got out, but trial counsel impeached her testimony, establishing that when interviewed by police within days of the murder, she had stated that she saw the individual at approximately 4:40 p.m. Using that time period along with the times established by the AT&T evidence and the traffic camera, defense counsel argued that the defendant could not have committed the murder in the time period he was in the area of Williams's home. The timeline from the AT&T records, and the exhibits and testimony created therefrom, provided defense counsel's basis to argue that the defendant would not have had time to commit the murder or have been in the area when it was likely committed. Defense counsel's failure to object to the admission of the AT&T records and concomitant testimony was reasonable trial strategy, and thus, did not constitute the ineffective assistance of counsel.

¶ 74    In addition to reasonable trial strategy, we find that the inclusion of Sergeant Wojtowicz's testimony did not result in prejudice to the defendant. Sergeant Wojtowicz testified regarding his specialized knowledge interpreting phone records and cellular tower data. The defendant is correct in the assertion that Sergeant Wojtowicz's testimony regarding the AT&T records had to come from his specialized training, rather than his personal observations of the AT&T records. See *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 100 (professional training is only a proper

25

foundation for expert testimony, and personal knowledge cannot be based on other people's statements). Sergeant Wojtowicz was not tendered as an expert witness, and thus, the admission of his testimony as lay opinion would normally be error. *Id.* ¶ 106. However, Sergeant Wojtowicz testified that he had received training in cellular phone forensics, computer forensics, and cellular record analysis. He further testified that he was familiar with reviewing and analyzing cellular phone records and cellular tower location information, and described in detail how the analysis was done in the present case. When testimony is improperly admitted as lay opinion, the error is harmless if the witness was, in fact, qualified as an expert, and thus would have been accepted as an expert by the trial court if so tendered. *Id.* ¶ 110. Defense counsel's performance is not deficient where an objection would have surely prompted the State to remedy its error and tender Sergeant Wojtowicz as an expert. *Id.* As Sergeant Wojtowicz was qualified, he would have been accepted as an expert by the trial court if so tendered, and we find no prejudice resulted to the defendant based on Sergeant Wojtowicz's testimony.

¶ 75                                    2. Gun Testimony

¶ 76    Next, the defendant argues that the trial court erred in admitting evidence that he owned a firearm that was not connected with Williams's death. The defendant argues that he was denied a fair trial because the gun evidence, elicited by the State, was not relevant and was highly prejudicial.

¶ 77    At the trial court's discretion, relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Eyler*, 133 Ill. 2d 173, 218 (1989). "Relevant evidence means evidence having any tendency to make the existence of any fact in issue more probable than it would be without the evidence." *People v. Brewer*, 245 Ill. App. 3d 890, 894 (1993).

26

¶ 78    Here, the defendant did not possess any firearms at the time of his arrest and no guns were found in his residence. While a .22-caliber shell casing was found in the floorboard of Williams's vehicle, the shell casing was not matched to any gun that could have caused Williams's death.

¶ 79    Nonetheless, the State was permitted to present evidence that the defendant owned a gun in the past. The State presented this evidence through the defendant's police interview, where he admitted to shooting and possessing guns in 2009, and recounted an incident in 2011, where he claimed that Taylor lied and told her school that he possessed guns to get him in trouble. Evidence that the defendant had possessed a gun in the past was also admitted via the testimony of Aylexus and Taylor, who testified that they had seen the defendant with a gun at their prior residence. Their testimony, taken together, established that they had seen the defendant, at least four years prior to the murder and at a prior residence, with a gun that was black and placed in a purple Crown Royal bag.

¶ 80    Defense counsel failed to object to the admission of the gun evidence or include it in his posttrial motion, and thus, this claim of error has been forfeited. *Thompson*, 238 Ill. 2d at 611. Here again, as with the previous issue, the defendant requests that this issue be reviewed under the plain-error doctrine and as a matter of ineffective assistance of counsel.

¶ 81    The plain-error doctrine, as noted above, provides a "narrow and limited exception" to the general rule of forfeiture. *People v. Reese*, 2017 IL 120011, ¶ 72. The first step in plain-error review is determining whether any error occurred. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

¶ 82    The defendant argues that the evidence suggested that if he had possessed guns previously, or was familiar with guns, he was more likely to commit a murder. Further, the defendant argues that the gun evidence insinuated that the defendant was involved in additional criminal conduct other than the shooting for which he was tried. The State argues that the gun evidence was

27

introduced to corroborate the legitimacy of the defendant's internet research that involved the use of a specific type of a firearm for the commission of a murder that, based on the recovered shell casing and cause of death, suggested that the defendant was the gunman.

¶ 83    The defendant relies on several cases that held that the admission of the weapons themselves, or testimony about weapons that were known not to be the murder weapon, was erroneous. See *People v. Wade*, 51 Ill. App. 3d 721, 729-30 (1977) (testimony about a handgun found on the defendant when arrested, but ruled out as the murder weapon by ballistics, was reversible error); *People v. Maldonado*, 398 Ill. App. 3d 401, 422 (2010) (evidence of a shotgun found in the defendant's home, unrelated to the murder, could only suggest that the person possessing it was more likely to commit murder than someone who did not, and was thus irrelevant and inadmissible); *People v. Tucker*, 317 Ill. App. 3d 233, 241 (2000) (two guns that were totally unrelated to the victims' murders were offered to the jury and found to be harmless error). Those cases, however, are distinguishable, because the weapons themselves were admitted into evidence, whereas here, there was no weapon admitted into evidence. See *People v. Ross*, 2018 IL App (2d) 161079, ¶ 182. The defendant further cites cases where guns were admitted into evidence that were sufficiently connected to the crime as to be admissible. See *People v. Jones*, 22 Ill. 2d 592 (1961) (State admitted evidence of a revolver found in the automobile in which the defendant was riding); *People v. Ashley*, 18 Ill. 2d 272 (1960) (expert testimony established that the revolver produced at the trial was the weapon actually used in the robbery).

¶ 84    Testimony concerning a weapon may be admitted into evidence where there is proof that it connected the defendant and the crime. *Wade*, 51 Ill. App. 3d at 729. Such a connection between the weapon and the crime exists where the weapon is "suitable" for the commission of the offense. *People v. Jackson*, 195 Ill. App. 3d 104, 112 (1990).

28

¶ 85    In *People v. Ross*, 2018 IL App (2d) 161079, the introduction of the defendant's interview, where he admitted to the possession of firearms, was deemed an abuse of discretion where the guns referenced in the statements were insufficiently connected to the crime. *Id.* ¶¶ 178-188. The reviewing court found that the evidence was irrelevant, highly prejudicial, and allowed the jury to speculate and unreasonably infer that, because the defendant owned guns at some point, he was more likely to be the killer. *Id.* ¶ 188. Further, the reviewing court was concerned that the evidence could have played into certain jurors' negative opinions concerning gun ownership. *Id.* Nonetheless, the reviewing court found that the error was harmless, as the evidence of the defendant's guilt was overwhelming. *Id.* ¶ 189.

¶ 86    In this case, a gun was used in Williams's death, as the cause of death was a "gunshot wound of the head and neck." The State presented evidence that the shell casing recovered from Williams's vehicle was a Winchester brand and was either a ".22 long or a .22[-]long rifle caliber discharged cartridge case." None of the evidence presented demonstrated that the gun the defendant possessed in the past was capable of firing a .22-caliber bullet or was connected to the crime. Further, there was no evidence that the defendant possessed a gun on the day of the murder or in any proximity of time to the murder. Therefore, it is difficult to see how this testimony was relevant.

¶ 87    Moreover, we cannot credit the State's argument that the evidence corroborated the legitimacy of the defendant's internet research regarding the use of a specific type of a firearm for the commission of a murder that matched the recovered shell casing and cause of death. The gun evidence introduced did not include any information that the gun the defendant possessed in the past was suitable to the crime, *i.e.*, was capable of shooting a .22-caliber bullet. As such, it did

29

nothing to corroborate the legitimacy of the defendant's internet search history. Thus, we agree with the defendant that the introduction of such evidence was error.

¶ 88    Since the defendant has met his burden of establishing that a clear error occurred, we move to the next step of the plain-error analysis. The defendant argues that both prongs of plain-error review apply. Under the first prong of the plain-error analysis, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). What makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive. *Id*. The State argues that the evidence weighed strongly against the defendant, and we agree.

¶ 89    In deciding whether the evidence is closely balanced, a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case. *People v. Belknap*, 2014 IL 117094, ¶ 52. While there were no eyewitnesses to the crime, other evidence pointed to the defendant as the perpetrator and excluded any reasonable possibility that anyone else inflicted Williams's injuries. The State presented evidence that Williams was involved in a violent relationship with the defendant before the relationship ended. On Valentine's Day, a few days prior to the murder, Williams told the defendant that she was over him, that she wanted to be single, and that she was tired of his "shit." Almost immediately thereafter, the defendant engaged in a series of internet searches such as, (1) whether a murder weapon was needed to make an arrest, and (2) what evidence the State would need to make an arrest for murder. Later, on that same evening, the defendant searched for information relating to criminal investigations, such as how long the police investigated a crime before it is considered a cold case. The next day the defendant continued to search the internet for what types of evidence is needed

30

to convict a person of attempted murder, and what evidence the prosecutor would need to convict someone of murder.

¶ 90    On the day of the murder, the defendant had been texting Williams with no response. The defendant reached Williams by phone at around 1:30 p.m. and offered to bring her money that he owed her, but she demurred. The defendant asked for, and was given, a ride by Moore to Granite City and Williams's residence. At 3:10 p.m., Williams's daughter Taylor arrived home from school and had heard Williams on the phone with the defendant discussing the money he was going to drop off to her. Taylor saw the defendant standing near their residence by a stop sign after exiting a cream-colored car with a "bubble" shape. Moore picked the defendant up shortly thereafter, and they returned to Alton. At 3:25 p.m., Taylor and Aylexus tried to call Williams repeatedly without success.

¶ 91    The defendant was questioned about his whereabouts on the day of the murder and denied ever being in Granite City on numerous occasions. However, Taylor, Aylexus, and Moore all testified that the defendant was in Granite City and in the area of Williams's home near the time of death. Video evidence from two locations additionally showed the defendant was located in Granite City on the day of the murder during the times that would correspond with the last time Williams was seen alive.

¶ 92    Williams was murdered by a single shot to the head with a firearm using .22-caliber ammunition. The police issued a public statement regarding the murder but did not mention the cause of death, and particularly did not mention that Williams died as a result of a .22-caliber gunshot wound. Nonetheless, subsequent to the murder, while the evidence was still being processed by the police, the defendant was engaged in additional internet searches. The defendant searched or accessed, via web browser on his phone, what damage a .22-caliber gunshot would

31

cause at point-blank range. Other topics included whether a shot from a .22-caliber handgun would kill someone, "[w]hat can I kill with a Ruger 10/22," and "[c]an a .22[-]caliber pistol kill a person with one shot to the head?"

¶ 93　The defendant's theory of the case was that he was not in the area at the time of the murder, based on the cellular tower time periods and video evidence of the defendant's whereabouts, in conjunction with Michaelesha Wyatt's statement to the police during the initial investigation, that she saw a large black man walking away from Williams's vehicle at around 4:40 p.m. However, at trial, Wyatt testified that she saw the person walking away from the vehicle earlier, around the time that school got out. Using the time period of Wyatt's initial statement, along with the times established by the AT&T evidence and the traffic camera showing the defendant traveling away from Williams's house with Moore, defense counsel argued that the defendant could not have committed the murder in the time period he was in the area of Williams's home. The jury, however, was free to credit Wyatt's trial testimony over her initial statement. The remaining argument by the defendant was that he denied committing the murder, and no physical evidence tied him to the crime. The defendant's credibility was damaged by his insistence during his interrogation that he was never in Granite City on the day of the murder, and that he had not seen Williams at all that day.

¶ 94　Viewing the evidence in a commonsense manner in the context of the totality of the circumstances, we conclude that the evidence in this case was not closely balanced. Because the evidence was not closely balanced, we cannot find that the trial court's error in admitting the gun evidence tipped the scales in favor of the State, and therefore, the defendant has failed to meet his burden under the first prong of plain-error review.

32

¶ 95     The defendant also argues that the error falls under second-prong plain error. The defendant argues that the gun and improper AT&T evidence interfered with the integrity of the judicial process and violated the defendant's right to be tried by an unbiased trial court. The defendant cites *People v. Ramos*, 2018 IL App (1st) 151888, ¶¶ 1, 3, 12-25, for this proposition; however, the *Ramos* case was reviewing the issue subject to harmless error analysis, not second-prong plain error. *Id.* ¶ 24. Our supreme court has equated the second prong of the plain-error test with structural error such that automatic reversal is only warranted when the error causes a trial that is fundamentally unfair or unreliable. *People v. Jackson*, 2013 IL App (3d) 120205, ¶ 25. Such errors are systemic, serving to erode the integrity of the judicial process and undermine the fairness of the defendant's trial. *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009). Examples of structural errors include a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of the grand jury, denial of a public trial, and a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609. In such case, prejudice is presumed under the second prong of plain error. *People v. Sebby*, 2017 IL 119445, ¶ 50.

¶ 96     Here, the defendant does not argue any of the presumed prejudicial errors above and provides little argument in his brief why the introduction of the gun evidence, or even the gun evidence in combination with the AT&T evidence, was so serious that it rendered the defendant's trial fundamentally unfair or unreliable and challenged the integrity of the judicial process. Under the circumstances of this case, we conclude that the defendant failed to carry his burden of persuasion to satisfy the second prong of the plain-error doctrine.

¶ 97     The defendant also argues that the error in admitting the gun evidence constitutes ineffective assistance of counsel. As the defendant's failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel,

it is not necessary to first evaluate whether counsel's performance was deficient if a defendant is unable to show sufficient prejudice. *Strickland*, 466 U.S. at 697. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Instead, *Strickland* asks whether it is reasonably likely the result would have been different. *Id*.

¶ 98    Here, we do not find that the defendant has established prejudice. Considering the balance of evidence above, we do not find that the omission of the gun evidence would have resulted in a different outcome. As such, the defendant's failure to satisfy the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel on this issue.

¶ 99                             3. Footwear Comparison

¶ 100   The defendant next argues that the State failed to establish a proper foundation for the admission of Thomas Gamboe's footwear comparison conclusions. The defendant argues that forensic scientist Gamboe did not explain the basis for his opinion; however, the defendant fails to specifically point out what foundational element was lacking. The defendant simply argues that Gamboe's testimony about the "class characteristics" that he observed, without explaining the basis for his opinion, lacked the appropriate foundation, and was thus, reversible error.

¶ 101   While the defendant asserts that he raised an appropriate pretrial and posttrial objection to Gamboe's testimony regarding the foundational argument made on appeal, we do not agree. The defendant filed a motion *in limine* on February 21, 2017, wherein he objected to the admission of Gamboe's shoeprint identification testimony as more prejudicial than probative. The trial court ruled that it was not and was thus admissible.

¶ 102   The defendant did not make any argument that the State would not be able to lay an adequate foundation during the pretrial hearing, nor did he make a contemporaneous objection to foundation during trial. In fact, the record reveals that after the State made its offer to qualify Gamboe as an expert in the field of shoeprint identification, the trial court asked defense counsel if he wanted to question Gamboe regarding his expertise. Defense counsel responded, "No." The trial court then asked defense counsel if he had an objection to the State's offer to certify Gamboe as an expert. Again, defense counsel said, "No." In his posttrial motion, the defendant alleged that the trial court erred in allowing Gamboe to testify that shoes seized from the defendant were similar to shoeprints in the snow around the victim's car and house. The posttrial motion makes no reference to the lack of foundation for the admission of the evidence, and defense counsel stood on his argument from the pretrial motion hearing.

¶ 103   As noted previously, to preserve an issue for review, the defendant must object at trial and raise the matter in a written posttrial motion. *Thompson*, 238 Ill. 2d at 611. "This rule is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence, and a defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). As the defendant did neither, he forfeited this issue for review. *Thompson*, 238 Ill. 2d at 611.

¶ 104   Once again, the defendant argues that we should review this issue under the plain-error exception to the general forfeiture rule. We decline to do so. As noted above, the forfeiture rule is particularly appropriate where a defendant fails to object to a foundation issue at trial. Here, the defendant not only failed to object at trial, but also failed to raise the issue in a posttrial motion. The defendant further cites no specific deficiency in the foundation for Gamboe's opinion that the

shoes recovered from the defendant's home shared class characteristics that could have made a few of the prints that had been photographed in the snow, and thus, could not be ruled out as the shoes in evidence. The plain-error doctrine does not direct a reviewing court to consider all forfeited errors, as it is not a general savings clause to preserve for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court. *Herron*, 215 Ill. 2d at 177. The defendant's failure to raise this issue in the lower court deprived the State of the opportunity to correct any alleged deficiency in the foundational proof of Gamboe's testimony, and as such, we decline to review this issue under the plain-error exception to the forfeiture rule. We also note that defense counsel may have intentionally decided not to challenge the foundation for admitting the footwear comparison evidence. The defendant had maintained that he was not present at the scene of the crime. During cross-examination of Gamboe, defense counsel elicited testimony that Gamboe could not make a true identification of the defendant's shoes with the photographic images. Moreover, there was a print that was "absolutely dissimilar" when compared to the defendant's Nike shoes, thus suggesting that the shoe print came from someone else who had been near the victim's car. Therefore, the defendant's forfeiture of this issue for review stands.

¶ 105                                          B. Jury Instructions

¶ 106   The defendant's final argument concerns the instructions given to the jury. The defendant argues that separate instructions should have been given regarding the presumption of innocence for the sentencing enhancement, a definition of "personally discharged," a definition of "proximate cause," and a separate verdict form for the sentencing enhancement.[2] In this case, the applicable sentencing enhancement was that the defendant personally discharged a firearm that caused the

---

[2]See IPI Criminal 28.01 *et seq*. (approved July 18, 2014).

death of Williams. The defendant argues that the improper, non-standard jury instructions did not ensure that the jury found the sentencing enhancement beyond a reasonable doubt.

¶ 107   The defendant concedes that he did not include these contentions of error in a posttrial motion, and we separately note that he did not object to the jury instructions as tendered. Together, these two failures mean that he has forfeited the claim of error for review. See *Thompson*, 238 Ill. 2d at 611 ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion.").

¶ 108   Nonetheless, the defendant correctly argues that, under Illinois Supreme Court Rule 451(c), "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). When a defendant invokes review under Rule 451(c), we utilize the plain-error doctrine to review the claim of error. *People v. Durr*, 215 Ill. 2d 283, 296-97 (2005). The State, however, asserts that plain-error review is inapplicable because the defendant affirmatively acquiesced to the State's tendered instructions and failed to offer any additional instructions on behalf of the defendant. We agree.

¶ 109   Under the invited-error doctrine, a party cannot complain of error that it brought about or participated in. *People v. Villarreal*, 198 Ill. 2d 209, 227-28 (2001). The supreme court "has recognized that 'a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion.' " *People v. Patrick*, 233 Ill. 2d 62, 76 (2009) (quoting *Herron*, 215 Ill. 2d at 175). The forfeiture principle encourages the defendant to raise issues before the trial court, allowing the court to correct its own errors before the instructions are given, and thus disallowing the defendant to obtain a reversal through inaction. *Herron*, 215 Ill. 2d at 175.

37

¶ 110   Because defense counsel affirmatively acquiesced to the court's instructions, under the invited-error doctrine, the defendant cannot object to the instructions on appeal. *People v. Curry*, 2013 IL App (4th) 120724, ¶ 88. In such circumstances, a defendant's only challenge may be presented as a claim for ineffective assistance of counsel. *People v. Bowens*, 407 Ill. App. 3d 1094, 1101 (2011).

¶ 111   We review the defendant's claim of ineffective assistance of counsel under the standard set forth in *Strickland*. *Strickland*, 466 U.S. at 694. The defendant's failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Id.* at 697. When conducting a *Strickland* analysis, the defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). It is well settled in Illinois that counsel's choice of jury instructions is a matter of trial strategy. *People v. Douglas*, 362 Ill. App. 3d 65, 75 (2005). In assessing prejudice under *Strickland*, the question is whether it is "reasonably likely" the result would have been different. *Harrington*, 562 U.S. at 111. "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81. We review a claim of ineffective assistance of counsel *de novo. People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 112   The jury found the defendant guilty of first degree murder. Both the indictment and Illinois Pattern Jury Instructions, Criminal, No. 7.02 (approved July 18, 2014) (IPI Criminal No. 7.02) included the enhancement language that the defendant personally discharged a firearm, causing the death of Williams. The trial court imposed a 50-year sentencing enhancement for discharging

a firearm that proximately caused death to another person pursuant to section 5-8-1(a)(1)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)).

¶ 113   Generally, where Illinois Pattern Jury Instructions (IPI) are in place and are appropriate, the IPI must be used. *People v. Pollock*, 202 Ill. 2d 189, 212 (2002). Nonpattern instructions may be used; however, they must not confuse or mislead the jury. *Id.* Whether jury instructions accurately conveyed the law is an issue subject to *de novo* review. *People v. Smith*, 233 Ill. 2d 1, 15 (2009).

¶ 114   The relevant portions of the standard first degree murder issues instruction, IPI Criminal No. 7.01 (approved July 18, 2014), state:

"To sustain the charge of first degree murder, the State must prove the following propositions:

First Proposition: That the defendant performed the acts which caused the death of another,

and

Second Proposition: That when the defendant did so, he intended to kill or do great bodily harm to _____."

¶ 115   The relevant portion of the Illinois Pattern Jury Instructions, Criminal, No. 28.01 (approved July 18, 2014) (IPI Criminal No. 28.01), states:

"The State has also alleged that during the commission of the offense of _____ the defendant personally discharged a firearm that proximately caused death to another person."

¶ 116   Illinois Pattern Jury Instructions, Criminal, No. 28.02 (approved July 18, 2014) (IPI Criminal No. 28.02) states that the State must prove the instructed sentencing enhancement beyond

a reasonable doubt, and the Illinois Pattern Jury Instructions, Criminal, No. 28.03 (approved July 18, 2014) (IPI Criminal No. 28.03) states:

"To sustain the allegation made in connection with the offense of _____, the State must prove the following proposition:

That during the commission of the offense of _____ the defendant personally discharged a firearm that proximately caused death to another person. A person is considered to have 'personally discharged a firearm' when he, while armed with a firearm, knowingly and intentionally fires a firearm causing the ammunition projectile to be forcefully expelled from the firearm."

¶ 117 A jury instruction conference was held on the State's tendered instruction number 14, labeled as IPI Criminal No. 7.02, which was a modified version of IPI Criminal No. 7.02, and stated:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That the defendant *personally discharged a firearm* and shot Stacie Williams which caused the death of Stacie Williams; and

*Second Proposition*: That when the defendant did so, he intended to kill or do great bodily harm to Stacie A. Williams; or he knew that the acts created a strong probability of death or great bodily harm to Stacie A. Williams." (Emphasis added denoting modification.)

¶ 118 Upon noting that the instruction was modified, the trial court had the following exchange with the parties:

40

"[THE STATE]: Yes, Your Honor. I believe that case law is very clear that the State will be seeking the firearm enhancement and therefore a part of the finding from the jury is that the defendant personally discharged a gun, therefore, we included that language in the first proposition so that should the jury find that based on the proposition the defendant is guilty of first-degree murder they would have made a finding that it was by personally discharging a firearm.

[DEFENSE COUNSEL]: I wish they would have forgotten it.

THE COURT: Right. I would note for the record normally—normally what happens is it's a separate finding that the jury makes. It all goes back at one time. They either find that he committed the offense of first-degree murder or did not, and then they find—and then they're instructed that if they did they then go on to deliberate whether he personally discharged a firearm. In the Court's opinion I think by the State adding this language to actually add an onus to the State showing that he personally discharged the firearm which would not be required for the jury to convict [the defendant] of first-degree murder. So by adding that they have actually added a burden to themselves by doing so, but given the evidence in this case I understand why the [S]tate has made the decision to go forward in that matter. So if the defendant does not object the Court does not find that it is in any way confusing to the jury or takes away any of the findings that they would have to make and still meets the requirements that they find that [the defendant] committed the offense of first-degree murder and that he personally discharged a firearm, if they wish to seek a firearm enhancement."

The defendant argues that it was objectively unreasonable for his counsel to fail "to demand that the State afford [the defendant] the protections of *Apprendi*—separate IPI instructions about the

41

presumption of innocence for the enhancement, a definition of the enhancement, a definition of proximate cause, and a separate verdict form for the enhancement." The defendant argues that he was denied the effective assistance of counsel based on the alleged defects in the jury instructions.

¶ 119    In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the United States Supreme Court held that a fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Id.* at 490. An *Apprendi* violation may occur where the defendant is given an enhanced sentence based on a fact that was not submitted to the jury, or where the jury failed to find that the sentence enhancing factor existed beyond a reasonable doubt. *Id.*

¶ 120    The tendered jury instructions included a modified version of IPI 7.02, which included the language "personally discharged a firearm." The jury instructions did not include the sentencing enhancement instructions.[3] Finally, the jury was not provided with a separate set of verdict forms that included the ability to find the defendant guilty or not guilty of the sentencing enhancement. We find that the jury instructions that were given properly informed the jury of the burden of proof and the factual findings required for the sentencing enhancement, and as such, did not violate *Apprendi*. In *People v. Sharp*, 2015 IL App (1st) 130438, *rev'd on other grounds by People v. Veach*, 2017 IL 120649, ¶ 39, the court considered a similar comingled instruction in a case for attempted first degree murder. The court found no error in the instruction, where upon viewing the instruction as a whole, the instructions fairly, fully, and comprehensively informed the jury of the proper legal principles. *Sharp*, 2015 IL App (1st) 130438, ¶ 105.

¶ 121    In *People v. Aguilar*, 396 Ill. App. 3d 43, 59 (2009), the defendant similarly argued that the imposition of a 25-year sentence enhancement violated the principles articulated in *Apprendi*,

_____

[3]See IPI Criminal 28.01 *et seq*. (approved July 18, 2014).

because the verdict form returned by the jury did not contain a finding that defendant personally discharged a firearm during the offense. *Id.* The *Aguilar* court found that the fact that the defendant caused the death while "personally discharging a firearm" was included as a fact that the instruction required the State to prove to the jury beyond a reasonable doubt. *Id*. at 60. In returning its verdict finding the defendant guilty of first degree murder, the court found that the jury also found beyond a reasonable doubt that the defendant discharged a firearm, and thus, there was no *Apprendi* violation. *Id.*

¶ 122   Similarly, in *People v. Hopkins*, 201 Ill. 2d 26, 28-29, 36 (2002), the defendant was sentenced to an extended term in prison after being convicted of first degree murder, armed robbery, aggravated battery, and home invasion. In its analysis, the court in *Hopkins* noted that the jury returned a verdict of guilty for the charged offense of aggravated battery and the charge included the fact of the victim's age, the enhancing factor, as an element of the offense. *Id.* at 39. Accordingly, the age of the victim was an element proven beyond a reasonable doubt which permitted the trial court to sentence defendant to an extended term sentence. *Id.* at 39-40. We find that here, the general verdict form finding the defendant guilty was sufficient to satisfy *Apprendi*.

¶ 123   Further, there was overwhelming evidence that a firearm was personally discharged during the murder, as Williams was killed by a "gunshot wound of the head and neck." There was no other cause of death, and the fact that Williams was necessarily killed by a person who personally discharged a firearm was not in dispute; rather, the identity of the shooter was at issue. Given that the evidence that a murder by personal discharge of a firearm was undisputed, and the jury found that the defendant committed the murder by personally discharging a firearm beyond a reasonable doubt, the failure to tender a separate jury instruction on whether the defendant personally discharged a firearm did not prejudice the defendant in any way. See *People v. Mister*, 2016 IL

43

App (4th) 130180-B, ¶ 98 (failure to tender a jury instruction on whether the defendant was armed with a firearm as opposed to a dangerous weapon, a fact not in dispute, did not prejudice the defendant). We do not see how the jury could have been confused under these facts regarding the findings they were required to make, that is, whether the defendant was guilty beyond a reasonable doubt of both the charge and the sentencing enhancement.

¶ 124    The tendered instructions would not have changed the outcome of the trial, except that they created the potential for the defendant to have been found not guilty of murder had the jury found that the defendant did not personally discharge a firearm, a reality that leads us to believe that the failure to object was the product of reasonable trial strategy. Following a review of the record as a whole, we conclude that the defendant has not affirmatively proven that his convictions of first degree murder and the sentencing enhancement would have been different but for the claimed errors regarding the jury instructions as given.

¶ 125    The defendant's final jury instruction argument is that the jury was not instructed regarding proximate cause; however, the defendant does not comment on how such a defect was prejudicial error, and as such, it has been forfeited. See *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) (the failure to assert a well-reasoned argument supported by legal authority is a violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), resulting in forfeiture). Even so, we cannot see how in a case such as this, premised solely on direct causation, that there was any way the jury would have been confused in determining proximate cause. Had IPI Criminal No. 28.03 been tendered, the jury would have been instructed that to find the defendant guilty of the sentencing enhancement, they would have had to find that the defendant's personal discharge of a firearm proximately caused the death of Williams. As instructed, the jury found that the defendant *directly* caused the death of Williams. Nonetheless, this issue was forfeited. Accordingly, the

defendant has failed to demonstrate ineffective assistance of counsel with regard to the tendered jury instructions.

¶ 126                                    III. CONCLUSION

¶ 127   For the foregoing reasons, we conclude that the defendant invited the error regarding the introduction of the AT&T evidence and any error stemming from the jury instructions. Additionally, there was no error in the jury instructions that were given under the doctrine of invited error. We also find that the defendant forfeited any potential error in the introduction of footwear comparison evidence. While the introduction of the gun evidence was in error, we find that there was no plain error. We further find that the defendant did not receive the ineffective assistance of counsel. Therefore, we affirm the judgment and sentence of the circuit court of Madison County.

¶ 128   Affirmed.